HARTFORD ACCIDENT & INDEMNITY COMPANY, for itself, and for the use and benefit of Mrs. Alyeene Dueitt Lamey, Roland William Lamey and Robert Edward Lamey, Libelant,

v.

GULF REFINING COMPANY and Villa LeBlanc, Respondents.

Villa LE BLANC, Libelant,

v.

BLACK WARRIOR TOWING COMPANY, Respondent.

GULF REFINING COMPANY, Libelant,

v.

BLACK WARRIOR TOWING COMPANY and the Tug Rebel Warrior, Respondent.

George L. CURRY, Libelant,

v.

GULF REFINING COMPANY and Villa LeBlanc, Respondents.

John THOMAS, Libelant,

v.

GULF REFINING COMPANY and Villa LeBlanc, Respondents.

Martha Jane MORRISSETTE, Libelant,

v.

GULF REFINING COMPANY and Villa LeBlanc, Respondents.

Joseph RAUCH, mariner, for himself and others interested as salvors, Libelant,

v.

GULF REFINING COMPANY, Respondent.

Joseph RAUCH, mariner, for himself and others interested as salvors, Libelant,

v.

BLACK WARRIOR TOWING COMPANY, Respondent.

Curtis EASTERLING and Mrs. Willie Easterling, Plaintiffs,

v.

VILLA LE BLANC, Gulf Refining Company, and Travelers Insurance Company, Defendants.

Mrs. Willie EASTERLING, in her capacity as Administratrix, and as Personal Representative of Estate of Blanch Easterling, Plaintiff,

v.

BLACK WARRIOR TOWING COMPANY, Gulf Refining Company, Villa LeBlanc, and Travelers Insurance Company, Defendants.

Adm. Nos. 2262, 2312, 2313, 2328, 2329, 2330, 2400, 2438.

Civ. A. Nos. 3983, 3984.

United States District Court,
E. D. Louisiana, New Orleans Division.

Dec. 20, 1954.

Lemle & Kelleher, Selim B. Lemle, George B. Matthews, Chaffe, McCall, Toler & Phillips, Leon Sarpy, Fred J. Cassibry, New Orleans, La., Lyons, Piper & Cook, J. Terry Reynolds, Jr., Mobile, Ala., Herman & Herman, A. I. Kleinfeldt, New Orleans, La., for libelants and plaintiffs.

Fred J. Cassibry, May & Carrere, E. A. Carrere, Jr., Lemle & Kelleher, Selim B. Lemle, Chaffe, McCall, Toler & Phillips, Leon Sarpy, New Orleans, La., for respondents and defendants.

WRIGHT, District Judge.

This litigation, consisting of ten separate actions, grows out of an explosion and fire which occurred at the dock terminal of the Gulf Refining Company on the west bank of the Mississippi River, near Gretna, Louisiana, on May 11, 1952. All ten cases have been consolidated for the purpose of trial on the question of liability. The damage caused by the explosion and fire consists of three lives lost, three men injured, and considerable property damage to the terminal as well as to the tow of the Black Warrior Towing Company which was discharging gasoline at the Gulf dock at the time.

The Gulf terminal consisted of four flat steel deck barges moored end-to-end and secured to dolphins on the shore side. A number of eight-inch cargo lines ran the length of the dock and over the levee into Gulf's storage yard. The dock was equipped with several loading or discharging stations consisting of an eight-inch gate valve at the water's edge connected to a line running across the dock perpendicular to and connected with the longitudinal cargo lines. By proper adjustment of valves, gasoline being loaded or discharged at more than one of the stations could be run into or taken from the same longitudinal cargo line. The deck level of the dock was approximately seven feet above the water.

At approximately 3:00 A.M. on May 11, 1952, the M/V Rebel Warrior, pushing an integrated tow of three barges, arrived at the Gulf landing to discharge a cargo of Good Gulf gasoline. The M/V Rebel Warrior is a small river-type push boat, 58 feet in length by 20 feet in width, powered by two 400-horsepower Diesel engines. Her crew consisted of a master, pilot, chief engineer, assistant engineer, two deckhands, and a cook.

The integrated tow of the M/V Rebel Warrior was composed of the Barges RTC 107, 109 and 112. The 112 had a rake on the forward end and a square stern. The 107 had a rake on the after end and a square bow. The 109 had a square bow and stern, so that when the three barges were made up together, they gave the appearance of one integrated vessel. Each barge had eight cargo tanks, four on each side. An eight-inch cargo header, equipped with the necessary valves to service the cargo compartments, ran from the forward tanks to an eight-inch athwartship loading line, after which were a gate valve, a pump, a second gate valve, and another eight-inch athwartship line used in discharging cargo.

As the tow came alongside the Gulf dock on the morning in question, the 112 was spotted at the discharge or loading station near the down-river end of the landing, and the 107 and the 109 were spotted side-by-side at the discharge or loading station near the up-river end, the 109 being moored outboard to the 107. On arrival, the crew of the Rebel Warrior was furnished with two flexible rubber

hoses, one to connect the inshore end of the discharge line on the 112 to the gate valve on the dock, and the other to connect the inshore end of the discharge line of the 107 to the gate valve at the up-river dock discharge station. After these hoses were coupled as indicated, the crew of the Rebel Warrior, using another flexible rubber hose, coupled the outboard end of the discharge line of the 107 to the inboard end of the discharge line of the 109, so that the cargo of these barges could be discharged simultaneously at the same station.

The discharge pumps on all three barges were equipped with a Cummins Diesel engine with an air starter. The pump engines on 107 and 112 each had a clutch as well as an air tank. The pump of the 109, however, was directly driven in that the pump engine had no clutch. When the engine started, the pump started. In addition, since the 109 had no air tank, it was necessary that it obtain its air directly from the tug to start the engine.

The 112 began discharging first. The valves to each of its cargo tanks were opened up, the valve forward of the pump was opened, the valve aft of the pump was opened, and the pump engine started. The dockmen, employees of Gulf Refining Company, were notified of readiness to discharge. The dockmen opened the gate valve on the dock and the discharge of cargo from the 112 began. At this time, since all barges were to be discharged into the same longitudinal cargo line on the dock, only the closed position of the gate valve at the station where the 107 and 109 were to discharge prevented the gasoline being discharged from the 112 from backing up into the cargo discharge lines of the 107 and 109.

After the discharge of the 112 began, the Rebel Warrior moved from the 112 up-river to the 109 where she made up to the outboard side near the stern, with her galley door open some eight to ten feet forward of the outboard end of the discharge line on the 109, which end, unknown to the crew of the Rebel Warrior, was not equipped with a blind flange to prevent the unintentional discharge of any cargo which may find its way into that line. After furnishing air to the reservoir tank of the 107, the air line of the Rebel Warrior was then connected to the 109 and held in readiness for starting the pump engine. In the meantime, the crew of the Rebel Warrior had been opening the cargo valves on the 107, and were in the act of opening the cargo valves on the 109 when gasoline was seen running out of the outboard end of the discharge line of the 109 onto the deck of that barge and into the river. Several members of the crew of the Rebel Warrior yelled to the Gulf man on the dock to shut the gate valve, to which was connected the discharge line of the 107 and 109, and he did so. Just at that moment there was a flash of fire across the deck of the 109 near its stern, followed a few seconds later by an explosion which tore open the rake of the 107 and blew the pump and its engine into the air. The pump, with its engine attached, was subsequently found to have landed on the deck of the 107 halfway to its bow.

The Gulf Refining Company contends that the explosion occurred as a result of gasoline and gasoline vapors escaping through the outboard end of the discharge line on the 109 coming in contact with the fire from the galley range. Gulf contends that the gasoline emitted from this discharge line came from the tanks of the 107 or 109 or both through the operation of the pumps on those vessels. Black Warrior contends that the explosion resulted from the premature opening of the gate valve on the dock, causing the gasoline being discharged from the 112 to back up into the discharge line of the 107 and 109.

■ There can be no serious question that the flash, followed by the explosion and fire, resulted from gasoline vapors emitted from the discharge line of the 109 coming in contact with the open fire in the galley range. All physical evidence in the case, as well as the expert testimony, bears out this conclusion. The really serious question presented is did the gasoline come from the 112,

through the prematurely opened gate valve on the dock, or did it come from the 107 or 109 or both? LeBlanc, the dockman of the Gulf Refining Company, who was standing by the valve in question ready to operate it when barges 107 and 109 were ready for discharge, maintains that he did not open the valve and, consequently, that he did not close it after opening it. Subsequent to the fire, the valve was found in a closed position with the handle thereof covered with unsmudged soot, indicating that it was in that position at the time of the fire. LeBlanc's insistence that he did not open the valve momentarily is the one part of his testimony to which he has consistently adhered in the Coast Guard hearings, this trial, and the statements taken from him by representatives of the parties. On practically every other point, however, LeBlanc's testimony is a maze of self-contradictions, to such an extent that it should be discredited completely. Moreover, his testimony that he did not open the gate valve is incredible in view of the uncontradicted physical findings.

It is conceded that the gasoline emitted from the outboard end of the discharge line of the 109 came either from the 112 through the open valve on the dock, or from 107 or 109 or both after their pump engines had been started. The physical findings show that the engine and air starter controls on the 109, after the fire, were in the off position covered with unsmudged soot, indicating they were closed at the time of the explosion. And everyone, including LeBlanc, admits that of the two barges, 107 and 109, 109 was to begin discharging first. In addition, at the time of the Coast Guard investigation, two days after the explosion, when the flexible hose was detached from the gate valve on the dock, a small quantity of gasoline was found trapped in the valve outboard the gate. Since the discharge lines on the barges were several feet lower than that gate valve, and since the quantity of gasoline emitted from the outboard end of the discharge line of the 109 was relatively small, it is unreasonable to conclude that the pump on either the 107 or the 109 is responsible for the gasoline found by the Coast Guard in the valve outboard the gate. With the eight-inch discharge line wide open on one end and with only the small quantity of gasoline being emitted therefrom, it is inconceivable that gasoline was emitted from the other end of the discharge line under such pressure as to drive it upward several feet to the gate valve.

In addition to these physical findings, there is the testimony of all of the witnesses, except LeBlanc, that neither the engine nor the pump of the 107 or the 109 was operating, nor even ready to operate, when the gasoline was seen to flow from the outboard end of the discharge line on the 109, and at least two witnesses have testified that they actually saw LeBlanc shutting the dock valve off in response to yells from the Rebel Warrior crew that gasoline was being discharged overboard.

The gasoline would never have been discharged overboard, however, if the outboard end of the discharge line of the 109 had been equipped with a blind flange. It was the grossest kind of negligence on the part of the Rebel Warrior to commence an unloading operation without the blind flange in place. In fact, for some tank vessels it is a violation of the Coast Guard regulations not to have such a blind flange in place at any time.[1] In addition to the Rebel Warrior's failure in this regard, there is the open fire in the galley range with the vessel moored in a position alongside the 109 so that the gasoline and fumes from the discharge line could actually run almost directly into the galley. Technically, it may not be a violation of Coast Guard regulations for the tug, with her galley

---

1. 46 U.S.C.A. 391a; 46 C.F.R. 32.50–15. The regulation applies only to tank vessels constructed or converted after July 1, 1951. The tank barges in suit were built as separate units before July 1, 1951. They were converted into an integrated tow after that date, but this apparently is not the type of "conversion" contemplated by the regulation.

fire burning, to be alongside a barge preparing to discharge gasoline.[2] In the circumstance of this case, however, it, too, constituted the grossest kind of negligence.

It would serve no useful purpose to speculate on how and why the explosion following the flash fire was concentrated in the rake of the 107.[3] It is obvious that the air in the rake was of an explosive consistency. When that air was subjected to the fire caused by the spillage of gasoline, the explosion resulted, an explosion which would not have occurred but for the premature opening of the gate valve by Gulf on one hand and the failure of Black Warrior to blank off the outboard discharge line of the 109 on the other. These concurring acts of negligence, equally effective, were the direct and proximate causes of the damage in suit.

As an alternative defense, Black Warrior pleads two provisions of the contract with Gulf under which the gasoline in question was being transported. The first of these provisions, denominated in the contract the "Force Majeure" Clause,[4] provides that neither party shall be responsible or liable for any loss or damage caused by "Acts of God * * * fire, explosion, neglect, default or barratry of the master or crew * * * or any other cause, whether similar or dissimilar to the foregoing, which is beyond their control." Under the second of these provisions, entitled "Release" Clause,[5] Black Warrior is not liable for loss or damage to cargo regardless of the cause provided "reasonable care shall

---

2. See 46 C.F.R. 35.35-30; 46 C.F.R. 35.35-25; 46 C.F.R. 35.35-20; 46 C.F.R. 35.35-42.

3. The expert testimony shows the flash point of gasoline, or the point at which ignition takes place when subjected directly to an open flame, to be minus 45° Fahrenheit. Ignition of gasoline by combustion requires heat of 500° Fahrenheit. Liquid gasoline will only burn and gasoline vapor will not explode when there are more than six parts of vapor to 100 parts of air. The expert testimony suggests that the escaping gasoline and vapor, when subjected to the open flame of the galley range, started a fire which, following the source of the gasoline, found its way back into the discharge line of the 109 through the open outboard end and then ran through the discharge lines of the 109 and 107 until it reached the rake of the 107 wherein it found the proper explosive mixture of gasoline vapor and air.

4. The "Force Majeure" Clause of the contract reads:
"Force Majeure: Neither Owner, Charterer, the tow, her master or owners, nor any other equipment used by Owner, shall be responsible or liable in any way for any loss or damage, or for any failure or delay in performance hereunder arising or resulting from: Acts of God, Perils of the waters, or of navigation, strikes or stoppage of labor for whatever cause, fire, explosion, neglect, default or barratry of the master or crew, enemies, pirates, assailing thieves, seizures, arrest or restraint of princes, rulers or people riots or civil commotion, compliance with any law, rule, order, regulation, restriction, recommendation or request of any government or agency thereof or any person purporting to act under authority thereof, or any other cause, whether similar or dissimilar to the foregoing, which is beyond their control."

5. The "Release" Clause of the contract reads:
"Release: The cargo shall be transported at the sole risk of such cargo, in so far as loss or damage to such cargo is concerned, and neither Owner nor any person employed by Owner, nor any vessel, barge or other equipment used hereunder, shall be liable for any loss of or damage to such cargo regardless of the causes of such loss or damage, provided only that Owner shall have exercised due diligence to make such vessel and other equipment seaworthy and properly manned, equipped and supplied, and provided that reasonable care shall have been exercised in the receipt, stowage, handling, care and delivery of the cargo which shall be in the possession of the tow from the time that the petroleum products reach the barge pipe in loading until the products reach the shore line hose connection in unloading. Owner shall be entitled to the exoneration from liability under Section 3 of the Harter Act (46 U.S.C.A. § 192). Nothing in this contract shall be construed to deprive Owner of, or to limit Owner's rights to, any statutory protection or limitation of liability, which would otherwise by applicable."

have been exercised in the receipt, stowage, handling, care and delivery of the cargo." The release clause also gives Black Warrior the right to exoneration from liability under Section 3 of the Harter Act.[6]

▮ Before attempting to interpret these provisions, it may be well to determine what type of contract is here involved. The contract provides that Black Warrior will transport petroleum products for Gulf in barges towed and owned by Black Warrior. Such a contract is not one of towage but a contract of affreightment with a private carrier. Those cases, therefore, which limit the right of a common carrier[7] or a tug owner under a contract of towage[8] to negative responsibility for negligence, must be put to one side as inapplicable to the contract in suit which, since it is a contract of affreightment, must be interpreted in the light of Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110, 62 S.Ct. 156, 86 L.Ed. 89, and Santa Fe, Prescott & Phoenix Railway Company v. Grant Brothers Construction Company, 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787,[9] which hold that the highest public policy is found in enforcing the contract as made, including giving effect to any apt language therein providing against liability for negligence.

Black Warrior insists that the "force majeure" clause specifically provides against liability, on part of either party to the contract, for damage caused by fire or explosion and, consequently, Gulf and Black Warrior must each bear its own loss. Unfortunately, the matter is not that simple since the negligence of Gulf and Black Warrior contributed to the fire and explosion. Unless the force majeure clause can be read to stipulate against fire and explosion even when caused by negligence of the parties, that clause has no application here.

▮ Any effort to interpret the force majeure clause as contained in this contract is particularly unrewarding. The clause is but a mishmash of words, jumbled together, defying serious and responsible interpretation. The clause begins and ends with language which indicates that it relates only to Acts of God or other acts beyond the control of the parties. In between, however, are variously described acts, such as fire and explosion, which may or may not be beyond the control of the parties. Under the circumstances, a court should be reluctant to read into the contract an exemption from liability for negligence not clearly set out therein, particularly where, as here, the party relying on the exemption is the author of the contract.

▮▮ With reference to the release clause, Black Warrior fares no better. The release clause, by its terms, is applicable only where the carrier exercises reasonable care in the receipt, stowage, handling and delivery of the cargo. Since the facts as shown above establish negligence on the part of Black Warrior in the care of the cargo, it does not qualify for the relief provided under this clause. Nor does Section 3 of the Harter Act help Black Warrior. Section 3 of that Act provides relief for the carrier from consequences of fault in the management of the vessel, not the cargo. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.

Having determined that Gulf and Black Warrior are mutually and equally at fault in causing the fire and explosion

---

6. 46 U.S.C.A. § 192.

7. Liverpool and Great Western Steam Company v. Phenix Insurance Company, 129 U.S. 397, 440, 9 S.Ct. 469, 32 L.Ed. 788; New York Cent. Railroad Company v. Lockwood, 17 Wall. 357, 84 U.S. 357, 21 L.Ed. 627; Coggs v. Bernard, 2 Ld.Raym. 909, 918.

8. Sun Oil Co. v. Dalzell Towing Co., Inc., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311;

Compania de Navegacion, Interior, S. A. v. Fireman's Fund Insurance Company, (The Wash Gray), 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787; The Steamer Syracuse, 12 Wall. 167, 20 L.Ed. 382, 79 U.S. 167.

9. See also Texas Co. v. Lea River Lines, Inc., 3 Cir., 206 F.2d 55, 1953 A.M.C. 1894.

and that the force majeure and release clauses of the contract do not exempt either party from liability for its own negligence, the question arises as to how the liability for the damage caused by the fire and explosion will be divided, including the liability for the personal injury, death and salvage claims in suit. This question has been brought into sharp focus by two recent opinions of the Supreme Court, Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, and Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202. In Halcyon, the Supreme Court recognized that "Where two vessels collide due to the fault of both, it is established admiralty doctrine that the mutual wrongdoers shall share equally the damages sustained by each, as well as personal injury and property damage inflicted on innocent third parties." [342 U.S. 282, 72 S.Ct. 279.] Under this established admiralty doctrine, the right of contribution exists as between the mutual wrongdoers. The Court holds, however, that this doctrine does not apply to noncollision cases and that, in the absence of legislation, "it would be unwise to attempt to fashion new judicial rules of contribution * * *." In Pope & Talbot, Inc., v. Hawn, supra, the Supreme Court reaffirmed Halcyon and held further that in personal injury actions in admiralty, the law of comparative negligence applies.

▪ The case at bar is neither a collision case nor is it primarily a personal injury action, as in Halcyon and Pope & Talbot, although there are involved personal injury as well as death claims. Nevertheless, the teaching of Halcyon and Pope & Talbot leads to the conclusion that the modern admiralty doctrine of comparative negligence should be applied here and, in the absence of legislation, the right to contribution be denied. The circumstances surrounding the incident in suit are more likely to be found in connection with personal injury claims than with collisions at sea. This was a dockside operation involving property afloat, property ashore, and men in both places. In such circumstances there is no reason to look to the Rules of Oleron and the Laws of Wisbuy [10] to find a solution for the problem. The problem should be solved and liability established on the basis of comparative fault in accordance with modern admiralty practice. There is no need here for universal uniformity of law or application thereof as there may be in some aspects of admiralty. Here is a domestic situation and guidance should be sought in the Acts of Congress and the more recent expressions of the Supreme Court rather than in the venerable law of the sea.[11] This Court holds, therefore, that the doctrine of Halcyon and Pope & Talbot should be applied to this litigation in all its phases.[12] This means, in so far as the property damage claims of Gulf and Black Warrior, since both were equally at fault, each may recover one-half its damages from the other.

▪ The death and personal injury claims remain to be disposed of. The dead are William R. Lamey, Nolan Morrissette and Curtis Easterling.[13] Injured are Villa LeBlanc, George L. Curry and John Thomas. There are also two salvage claims, liability for which, under this opinion, must be borne separately by

10. These Rules and Laws are the source of the admiralty doctrine of equal division of damages and contribution. See The North Star, 106 U.S. 17, 21, 1 S.Ct. 41, 27 L.Ed. 91.

11. By adherence to the Brussels Convention of 1910, the equal division of damage rule regardless of degree of fault has been abandoned, even as to collision cases, by practically every maritime country of the world except the United States. See: Huger, The Proportional Damage Rule in Collisions at Sea, 13 Cornell L. Quarterly 530.

12. As a practical matter, any attempt to apply the equal division of damage rule, which contribution, to the property damage aspects of this case and the law of comparative negligence without contribution, to the personal injury claims as required by Halcyon and Pope & Talbot, would lead to some incongruous results.

13. The claim in behalf of Easterling has been settled as to all parties.

Gulf and Black Warrior as their interests appear. There can, of course, be no award for salvage rendered the Gulf terminal. Cope v. Vallette Dry-Dock Company, 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501.

The action for the death of Lamey is brought under 33 U.S.C.A. § 933 against Gulf and LeBlanc by the compensation insurer of his employer, Black Warrior, and Gulf and LeBlanc have impleaded Black Warrior. The evidence shows that Lamey was not a member of the crew of the Rebel Warrior. He was a shoreside employee of Black Warrior who supervised the entire discharge operations for that company. Under the circumstances, the negligence of Black Warrior, as shown above, was at least partially the negligence of Lamey for it was he who allowed the discharge operation to begin without blanking off the outboard end of the discharge line of the 109, and it was he who allowed the Rebel Warrior, with the open fire in her galley, to come alongside the 109 in the vicinity of the outboard end of the discharge line.

 The action in behalf of Lamey is predicated on the Louisiana death statute, there being no recovery for death under the general maritime law. Since under Louisiana law, contributory negligence of the deceased bars recovery for his death, the claim of the compensation insurer, in its own behalf as well as in behalf of Lamey's heirs, must fail. Byrd v. Napoleon Avenue Ferry Company, Inc., D.C., 125 F.Supp. 573.

 Nolan Morrissette was cook on the Rebel Warrior. It was he who permitted the open fire in his galley range in spite of the fact that the galley door was open almost immediately alongside the open outboard end of the discharge line of 109. He, too, must be held to have been contributorily negligent and recovery in his behalf must also be denied for the same reason as recovery is denied for Lamey's death.

 Curry was the relief engineer on the Rebel Warrior and Thomas was a deckhand. While neither acted in a supervisory position in connection with the discharge operation, both were, or should have been, fully aware of the dangerous circumstances under which the operation was being conducted, and there is nothing in the record to indicate that either did anything to correct the situation. Assuming Black Warrior's negligent contribution to the disaster to be fifty per cent, as the evidence here shows, this Court finds the negligent contribution of Curry and Thomas to be five per cent each. Their contributory negligence, however, does not bar their recovery. It does, however, diminish their recovery to the extent of their negligent contribution. Pope & Talbot, Inc., v. Hawn, supra. The attempt of Gulf and LeBlanc to recover over against Black Warrior in regard to any damages payable to Curry and Thomas must fail for the reason there is no contribution between tort-feasors in personal injury cases under maritime law. Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., supra.

 With reference to the claim of LeBlanc, there is nothing which need be added to what has already been said concerning his negligence except that since his negligence constituted Gulf's negligence, and Gulf's negligent contribution to this disaster has been assessed at fifty per cent, LeBlanc's must likewise be so assessed. He may recover, of course, only against Black Warrior and Black Warrior's impleader of Gulf must fail, for reasons already stated.

Decrees in accord herewith.