HARTFORD ACCIDENT & INDEM-
NITY COMPANY

v.

GULF REFINING COMPANY
and Villa LeBlanc.

Villa LE BLANC

v.

BLACK WARRIOR TOWING
COMPANY.

BLACK WARRIOR TOWING
COMPANY

v.

Villa LE BLANC.

GULF REFINING COMPANY

v.

BLACK WARRIOR TOWING
COMPANY.

BLACK WARRIOR TOWING
COMPANY

v.

GULF REFINING COMPANY.

GULF REFINING COMPANY

v.

George L. CURRY.

George L. CURRY

v.

GULF REFINING COMPANY
and Villa LeBlanc.

GULF REFINING COMPANY

v.

John THOMAS.

John THOMAS

v.

GULF REFINING CO., and
Villa LeBlanc.

Martha Jane MORRISSETTE

v.

GULF REFINING COMPANY
and Villa LeBlanc.

Nos. 15593–15598.

United States Court of Appeals
Fifth Circuit.

Feb. 20, 1956.

Rehearing Denied April 6, 1956.

Cameron, Circuit Judge, dissented in part.

Selim B. Lemle, George B. Matthews, Lemle & Kelleher, New Orleans, La., for Black Warrior Towing Company, Hartford Accident & Indemnity Co., Martha Jane Morrissette, George L. Curry and John Thomas.

Leon Sarpy, E. A. Carrere, Jr., New Orleans, La., Frederick E. Greer, Alex F. Smith, Otis J. Dillon, Shreveport, La., May & Carrere, Chaffe, McCall, Phillips, Burke & Hopkins, Henry H. Chaffe, New Orleans, La., Archie D. Gray, Pittsburgh, Pa., of counsel, for Gulf Refining Co.

Fred J. Cassibry, New Orleans, La., for Villa LeBlanc.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

These libels, combined for trial below and for argument on appeal here, present common questions of fact and law arising out of a single incident, an explosion aboard barges of the Black Warrior Towing Company while they were discharging their cargo of gasoline at the Gulf Refining Company dock terminal near Gretna, Louisiana. The various parties raise issues concerning negligence, Section 3 of the Harter Act, 46 U.S.C.A. § 192, Section 1 of the Limited Liability Act, 46 U.S.C.A. § 182, and the effect of an exculpatory clause in the transportation contract between the two companies principally involved here.

The facts leading up to within a very few minutes of the explosion are not greatly disputed. In the early morning hours of May 11, 1952, Black Warrior's integrated oil tow, consisting of the towboat *Rebel Warrior* and the barges RTC–107, RTC–109, and RTC–112, arrived at the Gretna dock with a cargo of gasoline. The barges had been loaded at the Sidney Richardson Oil Refinery in Texas City, Texas, under the direction of the pilot, Walter Kirk. The tow was brought as far as the Harvey Locks under the command of its master, Captain Peden. When the tow came through the locks, at approximately 2:00 A. M., Captain Taylor came aboard and relieved Captain Peden as master. Captain Taylor stayed in the pilot house of the *Rebel Warrior* until the tow reached the Gulf landing, about an hour later, when he went to bed. He was not awakened until the explosion. By that time, Captain Peden had gone ashore and the towboat, at least, was under the command of the pilot, Kirk.[1]

Kirk directed the mooring of the barges at the Gretna dock, which is on the west side of the Mississippi river, across from New Orleans. The 107 was placed at the upper end of the dock, with the 109 alongside it, and the 112 moored about 175 feet to the rear. Both the 107 and the 112 were spotted opposite 8-inch pipelines on the dock which come to within fifteen feet of the water's edge. Each of these lines is controlled by a gate valve and leads to the Gulf line which runs the length of the dock and then turns inland to the Gulf storage tanks there.

At about 4:00 o'clock, Lamey, Black Warrior's port engineer, came aboard the barge 112 to begin cargo discharge operations. He was aided by Curry, the tow's relief engineer, Dunaway, its tankerman, and Thomas and Easterling, deckhands. Gulf employees, notably LeBlanc, cooperated by readying the dock facilities to receive the gasoline.

1. Kirk testified that he came off duty at 5:45, about a half hour before the explosion, and went to his quarters. However, he explained that he was waiting in his quarters for "orders" from the port engineer, Lamey, to move the towboat off, after giving air to start the barges' pumps. He testified that he was in complete charge of the towboat and barges "till the other man [Lamey] come on." It is nowhere contended, however, that Lamey, who was a shoreside employee in charge of discharge operations, had authority over the towboat superseding that of the master or pilot, even during those operations.

They began with the 112. Gulf employees gauged the barge's tanks, attached a bonding wire from the dock to the vessel, and removed the plate, or flange, bolted across the face of the dock pipeline. They then checked the flanges, including the flange on the outboard end of the 112's discharge line. Curry, with Thomas's help, furnished compressed air from the towboat's engine room to start the barge's pump. Lamey and Dunaway primed the pump and helped Gulf employees attach a flexible rubber hose from the pipeline on the dock to the barge's discharge line, which extends across the stern of the vessel. They next opened valves leading from the barge's eight tanks into the cargo header line, which is a longitudinal pipe connecting compartments and running perpendicularly into the discharge line; and also opened two valves on the header line between the discharge line and the cargo intake line, which is parallel to and forward of the discharge line, but which plays no part in the discharge operation. Then after having started the pump engine and signalled the Gulf employees to open the dock valve, they began pumping gasoline into the Gulf line on the dock.

It was now about daybreak. The towboat, with Kirk in charge,[2] moved up to the 109 to give air to start the pumps on the 109 and the 107. It made fast to the 109 with a two-inch rope, the door to the towboat's galley being eight to ten feet upstream from the end of the discharge line on the 109. By this time, all of Gulf's employees except LeBlanc had left the dock, and Lamey and Dunaway helped him fasten the rubber line from the dock to 107's discharge line. Dunaway, together with Thomas and Easterling, fastened another length of rubber hose from the discharge line of the 107 to the discharge line of the 109.

The cook, Morrissette, then called from the galley that breakfast was ready, and Thomas and Easterling went in to eat. Shortly thereafter, Curry, having finished hooking up the air hose to furnish air to the pumps on the 109 and the 107, also went into the galley to eat breakfast.

Lamey and Dunaway continued readying the barges for discharge. Moving from stern to bow on the 107, they opened valves leading from the tanks to the cargo header line, and then, with Lamey about ten feet in the lead, crossed over to the bow of the 109. Going from bow towards the stern on the 109, they continued to open the corresponding valves on that barge. At this point, Thomas and Easterling, and then Curry, finished eating and stepped back out on the barge. According to Thomas's and Curry's testimony, they saw gasoline running from the open end of the discharge line on the 109 in a stream filling about a third of the eight-inch opening of the pipe, and spilling out on the deck of the 109. Thomas testified that he shouted to a man on the dock to turn off the dock valve, and that the man began to do so. In a moment, however, there was a flash across the stern of the 109, and then an explosion. Thomas was thrown alongside Dunaway on the barge and Curry was also knocked down. Thomas and Dunaway ran up on the dock to the levee runway, where Dunaway saw LeBlanc. Curry went up on the dock, where—he testified—he saw LeBlanc closing the dock valve; then, stopped by flames from following Dunaway and Thomas, he ran to the end of the dock and jumped into the river, from whence he was rescued. The bodies of Morrissette and Easterling were found several days later. Lamey's body has never been recovered, and he is presumed dead.

2. Kirk testified as follows:
"Q. What happened, to your knowledge, after the towboat went up alongside of 109? A. Well, we just landed the boat there and tied it up with one line on the port quarter.
"Q. What type line? A. Well, it was just a two-inch line, a rope line—It was about a two-inch line.
"Q. And—A. We were there to give air for the pumps.
"Q. What did you do then, Captain? A. It was just about time then for me to come *off* duty." (Emphasis supplied.)

The trial court found that the explosion was touched off by gasoline fumes arising from the spillage on the barge's deck and ignited by the fire in the galley stove. This gasoline, it found, came originally from the 112, passed down the Gulf line and escaped through the partially opened dock valve into the discharge line of the 107 and the 109, and thence out the open end of that line. It found that LeBlanc opened the valve prematurely, without having received the customary signal from the workers on the barge that they were ready to begin discharging, and that this negligence contributed 50% to the accident; that Black Warrior's employees were negligent in commencing the discharge operation without the blind flange on the outboard end of the line, and that Curry and Thomas were negligent in this respect and each contributed 5% to the accident; that Lamey was negligent in allowing the discharge operations to begin without checking the outboard end of the discharge line to be sure it was closed by a flange; and that Morrissette was negligent in keeping, and Lamey in allowing, an open burner in the galley stove while discharge operations were going on.

■ LeBlanc and the Gulf Refining Company attack these findings on the ground that there is no evidence to support the finding that LeBlanc opened the dock valve, and in the alternative, that if he did, this was not a proximate cause of the accident. The evidence clearly supports the trial court's finding in both respects. No gasoline was seen coming from the end of the discharge line until Curry and Thomas came out of the galley of the *Rebel Warrior*. All of Gulf's employees had by that time left the dock, except LeBlanc, and he was later seen by these same witnesses, according to their testimony, in the act of closing the valve. In addition, a Coast Guard Board of Investigation after the accident found a quantity of gasoline in the dock line outside of the valve, tending to negate the contention of Gulf and LeBlanc, because of the physical arrangement of the barges and dock facilities, that the gasoline causing the explosion came from the 109 or the 107.

■■ Regarding causation, Gulf and LeBlanc argue that in view of the gross negligence of Black Warrior in permitting a fire in the galley during discharge operations and in leaving the outboard end of the discharge line unflanged, LeBlanc's negligence was *de minimis*. The trial court found LeBlanc's negligence to be a 50% factor in causing the accident, and we cannot set aside this finding of fact unless it was clearly erroneous. Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha, 2 Cir., 133 F.2d 781, affirmed 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30. The evidence, quite contrary to this contention of Gulf and LeBlanc, is that LeBlanc's negligence was not *de minimis*. All who testified regarding discharging procedures, including Gulf's witnesses Yockman, the assistant superintendent of its Gretna terminal, and Hepting, its dock foreman, stated that it was the invariable custom in discharging to await a signal from the barges before opening a dock valve. Moreover, it cannot be argued, as Gulf and LeBlanc urge, that his action is excusable because he was not required to foresee that the other end of the discharge line would be open. The general rule is that one may still be found negligent despite the fact that the particular consequences of his negligence are not foreseeable. Restatement, Torts, § 435. Thus, here, if LeBlanc could not be required to know of the missing flange, he was at least chargeable with the knowledge that releasing gasoline down lines not normally used in receiving it, and in any event not even prepared to discharge it, was an act likely to bring dire results.

Gulf and LeBlanc argue also that under the *sine qua non* or "but-for" test of causation, LeBlanc's act cannot be regarded as the proximate cause of the explosion. They reason that if LeBlanc had waited for the proper signal before opening the valve, gasoline would still have spilled out the open end of the discharge line. This argument must be re-

jected on the evidentiary ground, as we consider the trial court to have rejected it, that this result would not have occurred, in the light of Dunaway's testimony that he and Lamey inspected the flanges on the 112 before giving LeBlanc the signal to open the gate valve there, and would have done the same on the 109 had LeBlanc allowed them the opportunity.

Black Warrior, meeting the issue of negligence head on, denies that it was negligent and contends that it breached no duty of care owed to Gulf by the leaving off of the flange from the outboard end of the discharge line or even from the placing of the *Rebel Warrior* with an open galley fire in such close juxtaposition to the open end during the preliminary stages of preparation for actual discharge operations. This argument is similar to that of Gulf, to the effect that these two circumstances of an open ended discharge line (unquestionably an abnormal condition) and an open galley fire close by (the unquestioned activating cause of the explosion) were still wholly innocuous and would have remained so *but for* the premature opening of the gate valve on the dock by LeBlanc.

Whether we view the relevance of these critical facts from the viewpoint of negligence or causation we are convinced that the existence of these conditions under all the circumstances of an actual unloading operation are such as would permit the inference by the fact finder that they were both negligence and a proximate cause of the explosion.

We cannot, therefore, hold that such finding by the trial court was clearly erroneous. Neither can we challenge the court's assessment of fault as being equal between Gulf and Black Warrior.

Agreeing, then, with the findings of fact of the trial court regarding the circumstances of the explosion and the assessment of fault equally between Gulf's employee and Black Warrior's employees,[3] we may proceed to consider the separate libels filed in the court below.

### The Personal Injury and Wrongful Death Libels.

■ The representative of Morrissette, and the Hartford Accident & Indemnity Co., subrogee of the rights of Lamey's representatives, filed libels against Gulf and LeBlanc for the wrongful deaths of these men. The district court, in applying the Louisiana death statute, LSA–C.C. art. 2315, held that claims brought under that act in admiralty were subject to all defenses against such claims, including contributory negligence, available to a defendant in a suit at law. This is, of course, the general rule. See Graham v. A. Lusi, Ltd., 5 Cir., 206 F.2d 223, and cases cited therein.

We may inquire, however, in what respects Morrissette and Lamey were guilty of the negligence attributed by the trial court to Black Warrior's employees. There can be no doubt that the discharge line on the 109 was unflanged for some time prior to the morning of May 11, and probably at least since the barges had been loaded at Texas City.[4] The

3. The trial court found [127 F.Supp. 474]: "[The] explosion * * * would not have occurred but for the premature opening of the gate valve by Gulf on one hand and the failure of Black Warrior to blank off the outboard discharge line of the 109 on the other. These concurring acts of negligence, equally effective, were the direct and proximate causes of the damage in suit."

4. Kirk testified that he never checked the flanges on the end of the discharge lines at Texas City, but only the cargo intake lines which were used in loading the barges. He stated: "A. No, I didn't check back of the pumps because it was—

"Q. But you didn't check, or you didn't determine whether or not it was blanked off with proper flanges? A. No, I didn't have to use it at all, and I didn't bother with it.

"Q. You never thought about it? A. I never bothered with it, because I didn't have to use it.

\* \* \* \* \*

"Q. And after you finished discharging, do you put the blank flanges back

trial court characterized the beginning of discharge operations without the flange in place as "the grossest kind of negligence".[5]

■ Such a condition would warrant an additional finding by the trial court that the 109 was unseaworthy, for with the discharge line open, a spark could have at any time ignited the gasoline vapors always present therein. The fact that the barge's owners had provided sufficient flanges to blank off the open ends of all cargo lines did not render the vessel any the less unseaworthy. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830. The ultimate responsibility for making sure that all cargo lines were flanged, before the tow left Texas City, lay with the tow's master or with its pilot, who supervised the loading operation there.[6]

■ The trial court found, however, that Lamey also was negligent, "for it was he who allowed the discharge operation to begin without blanking off the outboard end of the 109." On the other hand, as noted above, Dunaway's uncontradicted testimony was that he and Lamey checked the flanges on the 112 before beginning the discharge operation there, and were preparing to do the same on the 107 and the 109 when the explosion occurred.[7] There was no evidence

on? A. Well, sometimes I would and sometimes I wouldn't.

"Q. You mean you would leave them open? A. You would have a valve there that would cut the whole line—

"Q. Regardless of any valve, you mean you would leave the end of the line unflanged at any time? A. You can do it, yes. You have a valve to cut it off— the main valve to cut that off."

5. The testimony of an oil chemist at the trial was as follows:

"Q. You have heard testimony that even under the most ideal conditions there would be vapor in the header due to normal loading procedures, isn't that correct? A. It is. It is impossible to avoid having vapors in the header.

&ast; &ast; &ast; &ast; &ast;

"Q. Now, Mr. Shilstone, are you familiar with the blank flanges on the ends of the discharge line such as you saw in those diagrams? A. Yes, I am.

"Q. If you have a blank flange which is properly affixed with some sealing property, such as a gasket, is that satisfactory to shut off gas fumes and to prevent their escape? A. Yes, sir, The gasket is termed, in effect, a seal, and it is accepted as satisfactory and has proven itself in practice to be so.

&ast; &ast; &ast; &ast; &ast;

"Q. —do you consider it in your experience of having handled all these barges over the period of years, safe or unsafe practice to leave the blank flange off the end thereof? A. I would not provide a vessel a gas-free certificate, nor would I be authorized to by the American Bureau of Shipping, where a line is allowed to be open, such as that."

6. Kirk testified:

"Q. Now, in departing from Texas City, whose job was that to see that all lines were properly blanked off? A. Well, whoever the loader was. I was the loader of that one.

"Q. You were the loader? A. Yes."

7. Dunaway testified, regarding the 112:

"A. &ast; &ast; &ast; Then we checked the flanges—

"Q. When you say 'we'— A. Mr. Lamey and I.

"Q. You and Mr. Lamey? A. Yes, we work right together until we get everything going. We checked the flanges and then we opened up the valve and we asked the dock man was he ready to go, and told him that we were ready when he was and he told us to go ahead and start pumping."

Regarding the 109:

"Q. What happened after you opened those four valves? A. We walked on back towards the engine, going back to check for the flanges and all of that.

"Q. When you say 'check for the flanges,' who do you mean? A. We were going to check your discharge line, and also the intake line for flanges, all of them.

"Q. Up to this time, had you done any checking or preparations on the stern of 109? A. No, I hadn't.

"Q. Other than crossing over the barges, had you been on the stern of 109 up to this time? A. Not behind the engine, not as I recall.

"Q. So, you were walking back to check your flanges, and what did you do then? A. Well, checked the two valves by the pump, and after we see if it is—

that Lamey knew of the absence of the flange, but there is evidence that he would have checked it before starting the pumps or authorizing LeBlanc to open the dock valve. The trial court thus imposed a duty on Lamey to make a complete inspection of the barges, for unseaworthiness, immediately on coming aboard to conduct discharge operations. We cannot agree that it was a breach of due care on Lamey's part to postpone his inspection of the equipment he was to use until immediately before he was prepared to use it. He could not reasonably be required to foresee, in other words, that from the moment he came aboard the barges in the morning, a condition existed, and had existed before their arrival, which imperiled the lives of the entire crew. The fault for leaving the discharge line unflanged lay, as we have said, with the master or the pilot; and in the light of the usual warranty of a vessel's seaworthiness at the beginning of a voyage, The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644, we see no reason why Lamey should have presumed the fact to be otherwise.

 The trial court also found Morrissette negligent in keeping, and Lamey in allowing, a fire in the galley stove while the towboat was alongside the 109. It was sworn to at the trial that it was the custom aboard the *Rebel Warrior* to keep the galley fire going 24 hours a day.

Coast Guard regulations allow this, provided that "the senior deck officer on duty" makes an inspection "to determine whether in his judgment galley fires may be maintained with reasonable safety." [8] The pilot, Kirk, testified that it was customary to douse galley fires when the towboat went alongside the barges. However, he knew that breakfast was being prepared, and that the order, if there was such, was being violated, and admitted that he made no attempt to enforce it. Moreover, the cook cannot be charged with knowledge of the absence of the flange or of the danger that would result therefrom. Kirk brought the towboat alongside the 109, with the galley door roughly opposite the open discharge line, and although he was in his quarters reading a newspaper at the time of the explosion, he was waiting to move the towboat down river. It is clear that it was his duty to ascertain the safety of keeping a fire in the galley while the towboat was moored to the 109, and that this matter of judgment under applicable regulations could not be tacitly delegated by him to the cook. Nor can it validly be argued that during this period the senior officer's responsibilities for safe practices aboard the towboat devolved upon the port engineer, to be resumed by the pilot only when the towboat moved away from the 109. The port engineer was the shoreside employee solely responsible for the dis-

"Q. I mean, what did you actually do this particular morning? What happened? A. We were coming on back that far, and then a flash ran over on us—in other words, the fire, and blazed up right on us."

8. 46 C.F.R. 35.30–5
"(c) Galley Fires. Galley fires are normally permitted during cargo transfer operations: *Provided*, That prior to loading Grades A, B and C cargoes the senior deck officer on duty, who shall be be a licensed officer or certificated tankerman, shall make an inspection to determine whether in his judgment galley fires may be maintained with reasonable safety during the loading operation."
Although the phrase "during the loading operation" might seem to limit the application of this regulation to loading,

as contrasted to both loading and discharge operations, Lieutenant Commander Pearce of the Coast Guard, when asked about the galley fire here, testified: "The regulation in question is 35.30–5—The answer would be that certain officers in charge may make certain examinations to ascertain that conditions are safe for the handling, and that is 35.35–20 of Subchapter D."
This provides that "Prior to the transfer of cargo, the senior deck officer on duty, who shall be a licensed officer or certificated tankerman, shall inspect the vessel to assure himself that the following conditions exist:
"(i) In loading Grades A, B, and C cargoes, that an inspection has been made to determine whether galley fires can be maintained with reasonable safety."

charge operations, but although those operations required air from the towboat, he at no time gave any order regarding its movement or operation, and indeed, even if he had, this could not have relieved the master or the pilot from their responsibilities to the vessel. The B.B.No. 21, 2 Cir., 54 F.2d 532.

■ In the libels for personal injuries brought by Curry and Thomas against Gulf and LeBlanc, the trial court found that the negligence of each of these libelants contributed 5% to the accident, and thereby diminished their rights of recovery to this extent. We cannot regard this finding as clearly erroneous. Although Thomas was only a deckhand, and Curry the relief engineer aboard the tow, both of them came with the tow from Texas City, and were aware, or should have been aware, of the fact that the discharge line on the 109 was open, and therefore likely to cause an explosion. The finding that LeBlanc's negligence was a 50% factor in the explosion is likewise affirmed.

■ Gulf has filed, in each of the personal injury and wrongful death libels, a petition under Admiralty Rule 56 to implead Black Warrior, on the ground that Black Warrior's negligence was the sole cause of the accident. The finding of the trial court, which we affirm, that Black Warrior and Gulf were equally negligent, forecloses any right on the part of Gulf to indemnity. Moreover, Gulf has no right to *contribution* from Black Warrior, its joint tortfeasor in a non-collision maritime injury case. Halcyon Lines v. Haenn Ship, etc., Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318.

### Black Warrior's Claim of Exculpation for Cargo Damage.

■ Black Warrior here urges three grounds for denying Gulf's claim for recovery for the cargo destroyed in the explosion and resulting fire. The first is the release clause in the transportation contract between the two companies, which also incorporates Section 3 of the Harter Act, 46 U.S.C.A. § 192. Regarding this defense, it is important only to note that exemption both under the clause in question and under the Act [9] is predicated on the owner's exercising "due diligence" in making the vessel

9. The clause reads:
"Release: The cargo shall be transported at the sole risk of such cargo, in so far as loss or damage to such cargo is concerned, and neither Owner nor any person employed by Owner, nor any vessel, barge or other equipment used hereunder, shall be liable for any loss of or damage to such cargo regardless of the causes of such loss or damage, provided only that Owner shall have exercised due diligence to make such vessel and other equipment seaworthy and properly manned, equipped and supplied, and provided that reasonable care shall have been exercised in the receipt, stowage, handling, care and delivery of the cargo which shall be in the possession of the tow from the time that the petroleum products reach the barge pipe in loading until the products reach the shore line hose connection in unloading. Owner shall be entitled to the exoneration from liability under Section 3 of the Harter Act (46 U.S.C.A. 192). Nothing in this contract shall be construed to deprive Owner of, or to limit Owner's rights to, any statutory protection or limitation of liability, which would otherwise by [sic] applicable."

The Harter Act provides:
"§ 192. *Limitation of liability for errors of navigation, dangers of the sea and acts of God.* If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

seaworthy. The Act has been interpreted to require, for exemption, not only that the owner furnish all proper equipment for the vessel, but also that his servants exercise due care in using such equipment before the commencement of the voyage. International Navigation Co. v. Farr & Bailey Mfg. Co., supra. This same qualification for release must apply in the case of the contractual limitation of liability, since it uses language substantially similar to that of the statute.

 Black Warrior also relies on the "Force Majeure" clause in the contract, set out in a footnote below.[10] This clause exculpates the owner from liability for damages resulting from a number of causes, which might or might not stem from the negligence of the owner or his servants, but closes with the words "or any other cause, whether similar or dissimilar to the foregoing, which is beyond their control." The trial court characterized the clause as "but a mishmash of words," and, while it is our duty to construe it to the best of our ability, it is plain that in order to give it meaning, we must regard the words "beyond their control" as indicating an exculpation only when "fire, explosion" and other listed causes occur by the acts of nature or of third parties. Such was not the case. It is, therefore, not applicable.

 Black Warrior's final defense on Gulf's claim for damage to cargo is based on Section 1 of the Limited Liability Act, 46 U.S.C.A. § 182, the so-called fire statute.[11] This grants a vessel-owner exemption from liability for damage to cargo caused by fire, "unless such fire is caused by the design or neglect of such owner." It is settled law that unseaworthiness in itself does not constitute such neglect, and moreover, that to deny exemption the negligence must be that of the owner himself or his managing officers. Thus, while under the Harter Act, the negligence of a ship's employee is imputable to the vessel owner, under the fire statute it is not. Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L. Ed. 403; Consumers Import Co., Inc., v. Kawasaki Kisen Kabushiki Kaisha, supra.

 Gulf argues, first, that Lamey's negligence is imputable to Black Warrior—now an irrelevant contention in the light of our reversing the finding of negligence on Lamey's part—and, second, that the defense cannot be considered here because it was not urged below. It is quite true that this is the general rule. Benton v. Blair, 5 Cir., 228 F.2d 55. Nevertheless, we are not bound by it as an absolute principle, and since the case must be remanded to the district court for the ascertainment of damages, we may here hold the defense available to Black Warrior, reserving to the parties the right to introduce further evidence below regarding the applicability of the fire statute in this case. Cf. The I.S.E. 2, 9 Cir., 15 F.2d 749.

The following disposition is therefore made of these appeals:

10. "Force Majeure: Neither Owner, Charterer, the tow, her master or owners, nor any other equipment used by Owner, shall be responsible or liable or in any way for any loss or damage, or for any failure or delay in performance hereunder arising or resulting from: Acts of God, Perils of the waters, or of navigation, strikes or stoppage of labor for whatever cause, fire, explosion, neglect, default or barratry of the master or crew, enemies, pirates, assailing thieves, seizures, arrest or restraint of princes, rulers or people riots or civil commotion, compliance with any law, rule, order, regulation, restriction, recommendation or request of any government or agency thereof or any person purporting to act under authority thereof or any other cause, whether similar or dissimilar to the foregoing, which is beyond their control."

11. This provides:
"182. Loss by fire. No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

No. 15,593—Reversed and remanded.

No. 15,594—Affirmed.

No. 15,595—Reversed and remanded, with directions to allow the introduction of evidence by either party, or both, regarding the exemption of liability provided by 46 U.S.C.A. § 182.

No. 15,596—Affirmed.

No. 15,597—Affirmed.

No. 15,598—Reversed and remanded.

CAMERON, Circuit Judge (concurring in part and dissenting in part).

I agree with the conclusions reached by the majority and set forth in the able opinion except those resting upon the premise that the Black Warrior was guilty of actionable negligence in leaving the outboard end of the discharge line open during the activities incident to making the pipelines of barge 109 ready for the beginning of unloading operations. Those preparatory steps were to be completed entirely before the barge's pumps were set in operation and before the signal was given to LeBlanc that the valve should be opened so that Gulf's pipe line might receive the gasoline propelled to it by the barge's pumps.

But those preparatory steps had not been completed, the signal had not been given to start the barge's pumps and the signal had not been given to LeBlanc that discharge of the cargo was ready to begin. Until those signals were given and the pumps were started and LeBlanc's valves were opened, no danger could arise from the open-ended pipe. It was proper and without hazard, under the evidence, that either or both ends 'of this discharge line be left open until the beginning of discharge operations. Indeed, it is logical that they should be left open until it had been de-cided which side of the barge should be placed next to the shore; and also, to the end that the air in the pipeline might have a means of escape during the other preparatory steps.

The situation of the *Rebel Warrior* with the fire in the galley, of the two barges being prepared for cargo discharge, and with respect to all other relevant factors had existed for more than twenty minutes without incident. It was only the introduction of large quantities of gasoline into the discharge line of the 109 which caused the explosion or created any hazard at all. The crew of the *Rebel Warrior* had a right to perform their duties, assured that Gulf would not turn down upon them a column of gasoline until the signal was given. In fact, it is evident that Gulf's employees were keenly aware of the danger connected with opening the valve of its pipeline; for, as shown by the majority opinion, they were not content to place complete reliance in the *Rebel Warrior's* crew, but, themselves, checked the flange on the outboard end[1] of the 112's discharge line before essaying to connect up the flexible rubber hose between Gulf's pipeline and the discharge line of the 112.

It is clear to me that the open end of this discharge line was a perfectly proper and harmless condition, which could be made dangerous only by a wanton and unforeseeable act by Gulf's valve man. Without dispute, it would have been closed before the pumps were started or the signal given to Gulf to open the valve. The election by the *Rebel Warrior's* crew to defer closing the open pipe until after other steps had been taken in preparing for the beginning of the discharge operation, was not a negligent act and was not a proximate cause of the explosion. In my opinion, the Court below committed an error of law in judg-

1. Here is what the majority opinion states: "They began with the 112. Gulf employees gauged the barge's tanks, attached a bonding wire from the dock to the vessel, and removed the plate, or flange, bolted across the face of the dock pipeline. *They then checked the flanges, including the flange on the outboard* end of the 112's discharge line." [Emphasis added.]

ing this to be negligence. I dissent, therefore, from the portions of the majority opinion resting upon the affirmance of this part of the finding and judgment of the Court below.

On Petitions For Rehearing

PER CURIAM.

It is ordered that the petitions for rehearing filed in the above styled and numbered causes, be and the same are hereby denied.

CAMERON, Circuit Judge, dissenting from so much of the order as denies the respective petitions for rehearing filed by Black Warrior Towing Company, George L. Curry and John Thomas.