Mrs. Myrtle Lucille Goodman TREXLER,
Administratrix of the Estate of Robert
W. Trexler, deceased, Libelant,

v.

TUG RAVEN et al., and Crown Central
Petroleum Corporation, Respondents.

Petition of L & L TOWING CORPORA-
TION, et al., for exoneration from or
limitation of liability.

Petition of VERMILLION TOWING COR-
PORATION et al., for exoneration from
or limitation of liability.

CROWN CENTRAL PETROLEUM COR-
PORATION, Libelant,

v.

William W. MARSHALL and Richard S.
Smith, Respondents.

Margaret R. CAVEDO et al., Libelants,

v.

William W. MARSHALL and Richard S.
Smith, Respondents and Impleading
Petitioners,

v.

CROWN CENTRAL PETROLEUM COR-
PORATION, Impleaded Respondent.

Nos. 8210, 8213, 8214, 8249, 8268.

United States District Court
E. D. Virginia,
Norfolk Division.

Sept. 12, 1968.

Sidney H. Kelsey, Kelsey, Owens & Sanderlin, Norfolk, Va., for Myrtle Lucille Goodman Trexler, Admx.

Harry E. McCoy and Robert M. Hughes, III, Seawell, McCoy, Winston & Dalton, Norfolk, Va., Moncure & Cabell, Richmond, Va., for Crown Central Petroleum Corp.

R. Arthur Jett, Sr., and Waverley L. Berkley, III, Jett, Sykes & Berkley, Norfolk, Va., Eli Ellis, Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for L & L Towing Corp., Southern Transp. Co., Inc., Vermillion Towing Corp., William E. Law, Robert R. Vermillion, William W. Marshall, Richard S. Smith, the Tug RAVEN and Barge 104.

Francis N. Crenshaw, Crenshaw, Ware & Johnson, Norfolk, Va., for Edward L. Butts and another, John Fulton and Joyce Mae Fulton, Margaret R. Cavedo and Mary A. Cavedo.

Sands, Anderson, Marks & Clarke, Richmond, Va., for Margaret R. Cavedo and Mary A. Cavedo.

May, Garrett, Miller, Newman & Compton, Richmond, Va., for Edward L. Butts and another.

Hugh S. Meredith, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for J. B. Morris and William D. Clark.

Thomas H. Oxenham, Jr., Richmond, Va., for J. B. Morris.

Jack E. Greer, Williams, Worrell, Kelly & Worthington, Norfolk, Va., for Virginia Elec. & Power Co.

Burt M. Morewitz, Newport News, Va., Wells, Smithers & Bradshaw, Richmond, Va., for Hazel Franklin.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

During the early morning hours of July 5, 1961, a disastrous fire broke out

at the terminal of Crown Central Petroleum Corporation (Crown), located on the James River at Richmond, Virginia. At the time in question Tank Barge 104 (Barge),[1] with the Tug RAVEN (Tug)[2] alongside, was moored at the Crown dock discharging gasoline into Crown's storage tanks ashore. The fire brought about the death of a crew member of the Tug; the Tug and Barge were totally destroyed; Crown's dock and shoreside facilities were either destroyed or badly damaged; and the nearby homes and other property were likewise damaged or destroyed.

One William W. Marshall was the master of the Tug. Richard S. Smith was a mate on the Tug, but also served as licensed tankerman for the Barge which was unmanned. In these five consolidated actions, two of which are petitions for exoneration from or limitation of liability, the status of the claims of the respective parties may be summarized as follows: (1) Crown seeks to impose liability upon the Tug and Barge, their owners and charterer, as well as the master and tankerman, (2) Vermillion Towing, L & L, and Southern contend that Crown was responsible for the damage but, without conceding any fault on their part, they seek to limit their liability under the statute, 46 U.S.C., section 182 et seq., (3) in the two limitation proceedings, one filed by L & L and Southern (in which William E. Law is also named as a petitioner), the other filed by Vermillion Towing (in which Robert R. Vermillion and William E.

Law are likewise petitioners), L & L and Southern filed a claim in Vermillion Towing's limitation action, and Vermillion Towing filed a claim in the limitation proceeding instituted by L & L and Southern, (4) William E. Law, Robert R. Vermillion, William W. Marshall, and Richard S. Smith have each filed counterclaims against Crown, (5) all of the corporations and individuals heretofore named seek indemnity or contribution for such losses to third parties as may be determined, (6) the Estate of Robert W. Trexler seeks damages against the Tug and Barge *in rem*, and *in personam* against the owners of these two vessels, the charterer of the Barge, William E. Law, Robert R. Vermillion, and Crown, and (7) other parties filed claims in the limitation proceedings and a few elected to proceed against the master of the Tug, the tankerman of the Barge, and Crown. This memorandum will be confined to the issues of liability as well as the damage claim of the deceased seaman's estate; the various property damage claims being reserved for an appropriate reference. Included in the issues of liability will be a consideration of the rights, if any, to limit liability.

Crown's terminal is situated between the 4500 block of East Main Street and the James River. The storage tanks are located on a hillside approximately 110 to 120 feet from the mooring dock to which the Barge was secured. The Tug was moored outboard at the bow end of the Barge when the fire broke out.[3] The unmanned Barge was a steel welded tank

---

1. Tank Barge 104 was owned by L & L Towing Corporation (L & L) and, at the time of the fire, was operated by Southern Transportation Company, Inc. (Southern). One William E. Law was a stockholder and chief executive officer of both L & L Towing Corporation and Southern Transportation Company, Inc. The Barge was at one time owned by Crown who sold same to L & L. Except as hereinafter indicated, the relationship between L & L and Southern will be referred to as a "charter" and Southern as the "charterer" but, for reasons stated, the true relationship was probably that of bailor (L & L) and bailee (Southern).

2. The Tug RAVEN was owned and operated by Vermillion Towing Corporation. Robert R. Vermillion was a stockholder and chief executive officer of this corporation. Southern had previously owned the Tug, having sold same to Vermillion Towing less than three months prior to the fire.

3. The Barge was positioned by the Tug. The Barge was moored portside to the pier with its bow headed downstream. The Tug's bow was headed upstream, with the stern of the Tug protruding slightly downstream from the bow of the Barge.

barge, length 194.7 feet, breadth 34.9 feet, depth 10.7 feet, with 8 cargo compartments (four each on the port and starboard sides). It was equipped with an eight-inch Blackmer displacement pump located on the after deck at the after end of the No. 4 tank, with a pumping capacity of 1,100 to 1,200 gallons per minute at 350 rpm. The Blackmer pump was installed by Southern subsequent to the sale of the Barge by Crown to L & L as heretofore noted. The Barge passed a Coast Guard inspection on May 17, 1961. The Tug was of wooden construction, length 54.4 feet, breadth 17.0 feet, depth 6.0 feet, propelled by a General Motors twin diesel engine. A raised pilot house was forward, following which was a cabin with four berths, an engine room, and a galley on the aft end of the house. In addition to the master (Marshall) and the mate (Smith), the other crew members were Trexler, the now deceased, who served as deckhand, and Carter, the cook.

The voyage of the Tug and Barge began at Norfolk on July 4, 1961. The Barge loaded part of its cargo in tanks Nos. 2 and 3 across for Phillips Petroleum Corporation, and part in tanks Nos. 1 and 4 across for Crown. The Tug picked up the loaded Barge and departed for Richmond at 9:15 a. m.[4]

The arrival of the Tug and Barge was anticipated by Crown. Chadwick, the Assistant Superintendent employed by Crown, was in charge. Around the middle of the day on July 4, Chadwick gauged shore tanks Nos. 18 and 19 which were to initially receive the product from the Barge. Tank No. 18, with a capacity of 158,188 gallons, indicated that it had 101,690 gallons then in it, leaving space for an additional 56,498 gallons. Tank No. 19, with a capacity of 70,110 gallons, was gauged at having 8,223 gallons, leaving space for an additional 61,887 gallons.

When the Tug and Barge arrived at 11:30 p. m., the terminal was in charge of Price, a night watchman, who came on duty at 9:00 p. m. Price had already made one round of the terminal and, when the Tug and Barge arrived, he telephoned Chadwick[5] who came on the scene shortly thereafter. Chadwick proceeded with Smith to gauge the Barge's tanks which, according to gauging reports,[6] appeared to contain—

| Tank No. | Innage | Gross Gallons | Grade |
|---|---|---|---|
| 1—Port | 7′ 4″ | 36,498 | Silver |
| 1—Starboard | 7′ 5½″ | 37,129 | Gold |
| 4—Port | 10′ 7″ | 52,777 | Silver |
| 4—Starboard | 10′ 7″ | 52,777 | Silver |

Chadwick thereafter authorized the commencement of discharge operations at between 12:15 a. m. and 12:30 a. m. on July 5, 1961.

At midnight the night watchman, Price, began his second round. According to his testimony there were no leaks or other difficulties noted at the time. He made a third round at Crown's facilities at 1:00 a. m., and he did not notice any product spill or leaks in the area of the shore tanks or dock area.

4. Times shown in this memorandum are Daylight Saving Time. In some instances it has been necessary to convert the time from Standard.

5. The Tug and Barge stress the fact that Chadwick committed suicide on July 22, 1961. We do not believe that such a fact carries with it any implication that Chadwick or Crown were at fault. While the casualty may have been a motivating factor in the suicide, we cannot agree with the Tug and Barge that the suicide act is a confession of guilt.

6. There is a slight variance between the gauging reports following the completion of loading on July 3, 1961, at 9:30 p.m., and at the point of destination. The variance is not material.

He indicated that this last round consumed approximately 15 minutes.

The certificated tankerman, Smith, was in general charge of discharge operations from the standpoint of the Tug and Barge. Prior to the commencement of pumping operations he checked the bonding cable and hose. He did not check the Tug, nor did he ascertain whether any of the crew was smoking. On the subject of flashlights, there were none aboard the Barge. Smith testified that the Tug had two workable Coast Guard-approved flashlights on board when the voyage started from Norfolk. Prior to pumping at Richmond he claims to have tested each of these flashlights but found them to be defective. He subsequently borrowed a flashlight from Chadwick which, he states, was not Coast Guard-approved. After a few minutes Smith dropped and broke the borrowed flashlight. He then went aboard the Tug and obtained a nonapproved flashlight from the engine room. It was this nonapproved flashlight that he was using at the time of the fire. Smith was fully aware of the dangers involved in using a nonapproved flashlight in the proximity of gasoline.

All witnesses agree that the valve setting on the dock manifold was open to shore tank No. 19 at the time of the fire, thus indicating that gasoline was pumping to No. 19. As all other valves appeared to be closed, it follows that the discharge into shore tank No. 18 had been completed. The best estimate of time required in pumping operations to No. 18 is approximately one hour. From the evidence it appears that the Barge had been discharging into No. 19 when the fire broke out. Chadwick had opened the valve to No. 19 and closed the valve on No. 18.[7] He then walked to shore tank No. 20, where it was contemplated that the high-test gasoline would be pumped from the Barge and stored. Chadwick gauged No. 20 and then went to the plant office where he engaged in a brief conversation with Price, the night watchman. After approximately five minutes in the office, Chadwick went outside and started in the direction of the dock. He was, of course, facing the dock, the Barge and the Tug. At about that time he saw a fire near the end of the Barge closest to him. In a matter of seconds the fire erupted.

At this point it is well to consider the admissibility of Chadwick's testimony at a Coast Guard hearing on July 14, 1961—nine days after the fire and eight days before Chadwick committed suicide. The Tug and Barge, and their owners, vigorously contend that such testimony cannot now be considered. Disagreeing with this contention we find that all of the major parties were represented at the Coast Guard hearing; substantially similar issues were involved in that the Coast Guard was required to investigate the cause of the fire for the purpose of ascertaining whether personnel or vessels subject to their license had violated Coast Guard regulations; and a reasonably adequate opportunity was afforded all counsel in the cross-examination of Chadwick.[8] We agree with the Tug and Barge that, as a general rule, the only permitted use of testimony taken before a Coast Guard or Naval Board is confined to discrediting a witness after first laying a proper founda-

7. By inference, at least, Smith denies that Chadwick ever changed any of the valve settings as he testified that he never saw Chadwick make the change and contends that he would have observed such action if it had been taken. The Court rejects Smith's testimony on this point.

8. The Coast Guard hearing reflects that, in addition to Crown's counsel, the following counsel were present and participating: Messrs. Jett and Ellis, representing the owner of the Tug and charterer of the Barge at said hearing, but who also represented in this litigation the owner of the Barge, William E. Law, Robert R. Vermillion, Richard S. Smith, and William W. Marshall; Sidney H. Kelsey, representing the estate of the deceased seaman, Trexler. Only the Virginia Electric and Power Company and certain property owners were unrepresented at the Coast Guard hearing, and they have not interposed any objection to the testimony.

tion. The Abangarez, 60 F.2d 543, (E. D.La., 1932); Griffin on Collision, section 268. But in the latter authority it is also said:

"It has been intimated also that the testimony of a witness at such a hearing may be used in the admiralty trial if the witness is deceased and if the party against whom his testimony is offered had adequate opportunity to cross-examine (Sword Line v. Tug Joseph H. Moran, [D.C., 57 F.Supp. 183], 1944 A.M.C. 1375)." [9]

█ It seems that the better rule calls for the admissibility of Chadwick's sworn testimony before the Coast Guard. The requirements of oath and opportunity for cross-examination, even though it may be conceded that Chadwick could have been recalled (if living) for further examination, are present. The identity of parties and issues are substantially similar. McCormick on Evidence, section 230 et seq., pp. 480-492; Wigmore on Evidence, (3d Ed.) Vol. 5, sections 1386-1394, pp. 82-121.

The foregoing principle of law is supported by a long line of decisions, even in criminal cases.[10]

Tankerman Smith was aboard the Barge, apparently checking the No. 4 tank on the stern, when the fire broke out. It was the No. 4 tank from which gasoline was being pumped when the catastrophe occurred. There is a sharp dispute as to whether the fire started at the forward end of the Barge as contended by Smith and the owners and operators of the Tug and Barge, or whether it originated in the after end of the Barge as urged by Crown. We conclude that the greater weight of the credible evidence as corroborated by the physical facts leads to the finding that the fire commenced in the vicinity of the after end of the Barge.

There are four possible causes of the fire. At the outset it should be noted that, in order to create a fire, the three essential ingredients are fuel, oxygen and ignition. Fuel existed by reason of its presence in the Barge, the Crown shore tanks, and at least the pilot light in the Tug's galley. Oxygen was in the atmosphere. Turning to the ignition we find the possibilities to be (1) friction from the use of the nonapproved flashlight by tankerman Smith, (2) spark caused by friction of the Tug and Barge being moored together, and (3) presence of a burning pilot light in the galley stove of the Tug. The Tug and Barge urge that Crown permitted a shore tank to overflow, thus allowing the fuel to run down the slope of the hill into the water near the forward end of the Barge and that, in some unexplained manner, the fuel ignited either by reason of the friction caused by the Tug and Barge being moored together or possibly by an arc being formed between the pilot light on the galley stove and the fuel which allegedly had accumulated on the water immediately forward of the Barge or, as an alternative, by the fumes escaping from the No. 1 starboard compartment on the Barge. We agree with the Tug and Barge that, if the weight of the credible evidence established that a shore tank overflowed, Crown would at least be partially at fault and perhaps would be solely responsible. We do not think, however, that the credible evidence supports this argument.

Marshall, the Tug's master, Trexler, the deckhand, and Carter, the cook, were all aboard the Tug at the time the fire broke out. Smith, the mate of the Tug and tankerman of the Barge, was admittedly at the No. 4 starboard compartment of the Barge at the crucial moment. The lives of Marshall, Carter and Smith were saved by jumping into the water.

9. Also reported sub nom., The Dixie Sword, 57 F.Supp. 183, (E.D.N.Y., 1944).

10. Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900); Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); Smith v. United States, 4 Cir., 106 F.2d 726, 728.

See also: 29 Am.Jur. (2d), Evidence, section 738; Annot., 70 A.L.R. (2d) 494; Annot., 159 A.L.R. 1240; Annot., 79 A. L.R. 1392; Annot. 15 A.L.R. 495.

Trexler, however, endeavored to cross the Barge in an effort to reach the dock. He was caught in the fire, severely burned, and later expired.

Price, the night watchman, and Chadwick place the initial outbreak of the fire near the stern of the Barge in the vicinity of the No. 4 tank compartments. Carter first saw the fire near the bow of the Barge. Smith contends that he was facing north and that he turned around and saw the fire "in back of Trexler" who was then near the forward end of the Barge. As to Carter's testimony, it should be noted that he "looked to stern of tug" which was, of course, the bow of the Barge. Thus, Carter looked to his right as he came out the galley door of the Tug. He then rushed back to his room on the Tug and went overboard. Carter does not state that he looked for any fire toward the aft end of the Barge.

We think it significant that the burned flashlight was found in the vicinity of the No. 4 starboard compartment of the Barge and a fire extinguisher was likewise located lying near or against a cleat situated starboard of the aforesaid compartment when five men visited the Barge on July 7, two days after the fire. The flashlight was within 1 to 1½ feet of the dome of the No. 4 starboard compartment, lying slightly forward and a bit to its starboard. When the flashlight was picked up, there remained a light mark on the deck immediately under where the flashlight had been resting; a strong intimation that the flashlight had been in this position during the fire. There were two fire extinguishers found aboard the Barge; one mounted on a pipe or pole in the forward portion of the Barge, which was in its housing with its pin in proper place;[11] the other situated as heretofore described, out of its housing, with the safety pin and ring not there, affording credible circumstantial evidence

that there had been an attempt made to use the fire extinguisher. There is no evidence in this record indicating that this particular fire extinguisher was out of its housing or had been used prior to the outbreak of the fire. Obviously, tankerman Smith was the only person who could have reached this extinguisher after the fire started and, in addition, it was on the starboard side of the Barge in the general area where Smith went overboard. To remove the fire extinguisher from its housing or brackets would require that it be lifted upward to clear both rings, and, at the time of the inspection on July 7, the rings were in place and apparently not distorted or damaged, although the extinguisher was on deck. Smith emphatically denies the use or attempted use of any fire extinguisher.

We find that Smith, despite his assertions to the contrary, at least attempted to use the fire extinguisher. If the outbreak of the fire had been near the bow of the Barge, it is reasonable to assume that the extent of the fire would have been so great by the time it spread to the area of the No. 4 starboard compartment that Smith would not have even thought of the fire extinguisher in his haste to leave the Barge. It is likewise reasonable to assume that the fire broke out in the No. 4 starboard compartment and that the initial blaze was sufficiently confined to lead Smith to the belief that perhaps the fire extinguisher would be effective. While it is possible that Smith may have grabbed the extinguisher for the purpose of affording himself a chance to jump overboard, especially if the fire was spreading from the bow to the stern of the Barge, this possibility is rejected in light of Smith's statement to the effect that he never used or attempted to use the extinguisher. The Tug and Barge argue that some third person could have boarded the Barge on some occasion between the early morning hours of July 5 and the

11. The pin referred to as being on the fire extinguisher is placed there for safety reasons to prevent an accidental discharge.

While the pin is in place, the extinguisher will not discharge or operate.

time the Barge was boarded by five men on July 7. Acknowledging that there is such a possibility, we must remember that this was a steel welded barge and the heat from the fire would be rather extreme for many hours after the blaze was extinguished.

There are certain inconsistencies in Smith's testimony which bear scrutiny. Smith at first stated that Trexler was "on fire" when he initially saw him near the bow of the Barge. Following a recess Smith stated that he misunderstood the question and that Trexler was not "on fire" when he first observed him. Also, while it is possible that Smith was facing north, with his back to Trexler, he would have been facing in that direction solely for scenery purposes as the hinges on the No. 4 starboard tank cover are on the forward end of the cover and, when opened, the cover sits up at an angle of approximately 45 degrees, thereby making it highly improbable that the tankerman would have been doing any work facing toward the stern of the Barge, unless he was engaged in shifting the valves which operate the suction lines and stripping lines of the No. 4 port and starboard compartments which valves are located slightly aft, but in the immediate vicinity of, the manhole trunks. For what it may be

worth, one Kirtley, the assistant terminal superintendent for Crown, testified that, in subsequent conversations with Smith, it was apparent that Smith did not know where the fire started.[12]

The principal argument by the Tug and Barge to refute the contention that the fire originated in Smith's area is the fact that Smith was not actually burned, although there was black soot on his face while he was standing alongside the ambulance waiting to enter same. The fact that Smith was not burned is inconclusive as to the origin of the fire. Concluding that the fire originated in the No. 4 starboard compartment by reason of Smith's use of a nonapproved flashlight, it is not unlikely that the initial outbreak was of insufficient intensity to burn the face or body of the holder of the flashlight, and that this prompted Smith to run for the fire extinguisher.[12-A]

The very purpose of the Coast Guard regulation requiring the use of approved flashlights is to eliminate dangers occasioned by a spark created by opening or closing the switch, breaking the bulb, or permitting the metal case on the nonapproved flashlight from striking against other metal. Smith, the tankerman, conceded that he was aware of these potential dangers, but nevertheless used

---

12. Kirtley's testimony in discovery on this point is as follows: "One time he [Smith] told me there was a fire in the river, the next time he told me that Bob Trexler had hollered at him and said there was a fire. He said, I don't know where it was, but I ran." Smith does state that he heard somebody holler.

12-A. Not overlooked is the fact that Law, his brother-in-law (Lynch), and Kirtley, boarded the Barge on July 5 for the purpose of gauging the Barge's compartments to ascertain the fuel loss in the No. 1 and No. 4 tanks; the No. 2 and No. 3 tanks not having been for Crown. Law testified that this visit to the Barge was on the morning of July 5; Kirtley said it was during the afternoon; Lynch did not testify. It is obvious that this visit was solely for the purpose of gauging the tanks, and none of the parties observed the flashlight or fire extinguisher. Law

only related the positions of the tank tops, with Nos. 2 and 3 in position (covering the tanks); No. 1, port and starboard, were on the deck alongside the dome; No. 4, port and starboard, were likewise on the deck near the dome. The covers were replaced by this group. Crown's expert Venable, Bray (an insurance adjuster), and Kirtley apparently went aboard the Barge on the morning of July 7, accompanied by Bowman (Chief of Fire Prevention in Richmond) and Hudgins (Terminal Manager for Crown). Bowman did not testify. Hudgins was not examined as to this point. It is, of course, possible that someone went aboard the Barge and removed the fire extinguisher during the fire such as, for example, a fireman, but we believe that the thorough investigation conducted by all parties would have disclosed this individual if such had occurred.

the nonapproved flashlight as it was the only one available. Smith further admits that, in order to gauge the tank compartments on the Barge, it was necessary for him to use a flashlight to look in the open tank top with the screen removed.

■ In concluding that the sole proximate cause of the fire was Smith's use of the nonapproved flashlight, we have not overlooked the expert testimony adduced. It has been of material assistance in resolving the technical aspects of the case but, in the final analysis, the cause of the fire essentially stands or falls on the credibility of Smith's testimony. Analyzing this evidence it appears to be replete with uncertainties and contradictions. He stated that he used a Coast Guard-approved flashlight during the loading operation at Norfolk, and the Court accepts this as a fact. He also testified that there was another Coast Guard-approved flashlight "available" at that time, but the Court seriously questions that a second approved flashlight was available and in operating condition.[13] In fact, from an analysis of his testimony and Smith's reaction to questions propounded, the Court finds that there was only one operable Coast Guard-approved flashlight aboard the Tug when the Tug and Barge departed from Norfolk en route to Richmond, and that there were no flashlights of any description aboard the Barge.

## INDIVIDUAL LIABILITY OF LAW AND VERMILLION

■ Trexler's Estate seeks to impose personal liability upon William E. Law and Robert R. Vermillion. It is for this reason that Law and Vermillion joined in the petitions for exoneration from or limitation of liability. We need not discuss the limitation issue as we conclude that these individuals must be exonerated as to any personal liability.[14]

13. When questioned as to the approved flashlights aboard the Tug, Smith concedes that the approved flashlight or flashlights had not been used since the loading was completed at Norfolk. He continuously refers to the word "it" in speaking of flashlights, and commented as to the many "troubles" any tankerman has "with them lights." Smith stated he "tried it out on the boat while in the wheelhouse, before we started pumping." When questioned by the Court as to how many lights he tried out, Smith answered, "Both of them" and that each was defective. He further said: "They would not light, no, sir. One of them, I tried it two or three times to try to get it to light and I could not get it to light. I don't know, we have trouble with them every now and then. But to state what time we had them, I could not tell you." Smith indicated that he had no prior trouble with one flashlight, but had encountered difficulty with the other one. He conceded that, on discovery when questioned about trying out the approved flashlights, he had stated: "One was torn down and on one the batteries and bulb wouldn't work." The Court finds that when the Tug left Norfolk it had only one operable Coast Guard-approved explosion-proof flashlight aboard, and that the other flashlight was inoperable. It is singularly strange that Carter, the deckhand and cook on the Tug who also held a tankerman's ticket, testified that when all four crew members were in the galley drinking coffee, he saw a Coast Guard-approved flashlight on the galley table. This may have been prior to the time that Smith and Chadwick, accompanied by the other crew members on the Tug, commenced taking samples and gauging the compartments. Apparently, however, Smith never reported to the other crew members the nonoperating condition of any light. According to Smith, he used Chadwick's flashlight to gauge the tanks, and he did not know whether this was Coast Guard-approved. He advised Chadwick that he needed a light and the latter left with the flashlight previously used by Smith in gauging the compartments. After Chadwick checked his shore tanks, Smith returned to the galley for another cup of coffee and thereafter Chadwick returned with a flashlight. Smith used this light for a "few minutes," dropped it, and broke same. He claims that the flashlight delivered to him by Chadwick was nonapproved, but as this light had nothing to do with the fire it is immaterial to make any such finding. After breaking Chadwick's flashlight, Smith returned to the Tug and procured the nonapproved flashlight from the engine room, which flashlight he was using at the time of the fire.

14. In concluding that Law and Vermillion are not individually liable, it does not follow that there was any lack of privity or knowledge on their part.

The theory advanced by Trexler's counsel is that the corporate veil should be pierced. That Law and Vermillion worked hand-in-hand, with Law the dominating factor, cannot be disputed. Nevertheless, the three corporations, Southern, L & L and Vermillion Towing were separate legal entities.

This conclusion is fortified by Zubik v. Zubik, 384 F.2d 267 (3 Cir., 1967), cert. den., 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291. In that case, which involved a limitation of liability proceeding, there was a vigorous effort to pierce the corporate entity and the trial court found that there was no line of demarcation between the individual and corporate defendants. In an exhaustive opinion by Circuit Judge Van Dusen [15] on factual evidence believed to be considerably stronger to justify disregard of the corporate entity, it was recognized that the corporate entity, as a general rule, must be upheld in the absence of specific, unusual circumstances calling for an exception. Moreover, it was pointed out, a disregard of the corporate existence occurs only when the court must prevent fraud, illegality, injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime. In distinguishing between cases in bankruptcy or taxation on the one hand, and a corporate tort on the other hand, it is suggested that in the first line of cases there is a certain degree of reliance by the damaged party, whereas an injured tort claimant stands on a different footing. As stated in *Zubik:*

"Limiting one's personal liability is a traditional reason for a corporation. Unless done deliberately, with specific intent to escape liability for a specific tort or class of torts, the cause of justice does not require disregarding the corporate entity. The corporate form itself works no fraud on a person harmed in an accident who has never elected to deal with the corporation."

While it is true that Trexler, as a member of the crew of the Tug, came in constant contact with Law and Vermillion [16] he was carried on the books as an employee of Vermillion Towing from the time the Tug was purchased from Southern in April 1961, except for nine (9) days in June when Trexler was employed by Southern as a relief man on the tug SHRIKE. Knowing Law's interest in operating the Barge and contracting for the services of the Tug, it is not unlikely that Trexler may have worked in conjunction with Law, but he at all times knew that he was under the direct employ of Vermillion Towing and certainly was not the victim of any fraud.

Finding that the evidence is insufficient to justify the piercing of the corporate veil, there is no personal liability upon Law or Vermillion.

### LIMITATION AS TO THE BARGE AND LIABILITY OF SOUTHERN AND L & L

Both L & L as the owner, and Southern as the charterer or bailee, knew that the Barge was not equipped with any flashlight, to say nothing of Coast Guard-approved flashlights. Southern, under 46 U.S.C., section 186, may be deemed to be the owner of the Barge for the purposes of limitation of liability proceedings if, in fact, a charter actually existed. Aboard the Barge was a storage box or tool box where certain Barge equipment was maintained. Law, as the principal corporate officer of L & L and Southern, and as a certified tankerman in his own right, knew that Coast Guard-approved flashlights constituted a part of the necessary equipment of the Barge in loading

---

15. Judge Van Dusen sat as a member of the Court of Appeals while a district judge. Following oral argument in the case, he was subsequently appointed to the Court of Appeals.

16. Southern, having chartered the Barge from L & L, had a working agreement with Vermillion Towing to the extent that Southern had first claim upon the services of the Tug and its crew.

442

and unloading fuel.[17] Neither Law nor any corporate officer of Southern or L & L ever made any attempt to check as to the availability of Coast Guard-approved flashlights on the Tug; neither did Law nor any other corporate officer ever ascertain whether the tankerman brought his own Coast Guard-approved flashlight aboard the Barge or Tug when reporting for duty.

 It is a general rule of law that the owners of a vessel, and in this case Southern, owe a duty to see that the equipment of a vessel is in safe condition for use when the voyage is commenced. This duty is a personal one, the responsibility for which they cannot escape by delegating its performance to another.[18] In this case, Southern, acting through Law, its principal corporate officer and general manager, attempted to delegate the responsibility of providing approved flashlights to the Tug or tankerman who, incidentally, was a member of the Tug's crew.

Aside from the foregoing, it seems fundamental that any barge operator would be aware of the possible breakage or nonoperating condition of an approved flashlight. Law conceded that he was familiar with C.G.Reg. 35.30–30 pertaining to Portable Electrical Equipment which reads:

"Illumination may be obtained in any compartment by the use of approved explosion-proof, self-contained, battery-fed lamps; otherwise, no portable electrical equipment of any type shall be used in bulk cargo tanks, fuel oil tanks, cargo pump rooms, or even closed spaces."

 We think it clear that the Barge was unseaworthy at the commencement of its voyage by reason of lack of proper equipment, and for the additional reason that no effort was made to ascertain whether the proper equipment was readily available in the important function of loading and discharging a highly combustible cargo. Assuming that one approved operable flashlight was available at the start of the voyage, no provision was made for potential breakage, loss overboard, or the many contingencies that might arise. Since knowledge of the unseaworthiness of a vessel defeats the right to limit liability, the petitions of Southern and L & L are denied.

 We go further and find that Southern was guilty of negligence in failing to exercise due care in ascertaining whether the tankerman and/or the Tug were possessed of the proper equipment to carry out the discharge operation. According to Southern, Smith was its employee during such operation. Actually Smith was a regular employee of Southern who, at Law's suggestion, was hired by Vermillion Towing as mate on the Tug with the additional duty of serving as tankerman on the Barge during loading and discharge of the cargo. While Smith was apparently paid by Southern for his services as tankerman, the contract between Vermillion Towing and Southern provided that, "If during such operation Vermillion's personnel on its tug performs the necessary services in loading or discharging the said barge or other vessel of Southern, Vermillion is to receive an additional sum of $18.00 for each such loading or discharge." Thus, while Smith was directly paid by Southern, it was merely a compliance with the contract which, in turn, provided that Southern would pay Vermillion Towing, and the latter presumably would then have been required to pay the tankerman.

 The *in personam* liability of L & L presents a different question. An owner who demises his vessel is generally not liable to anyone but the demisee un-

17. On this point, Law was questioned and, in turn, answered:
"Q. As an officer of these corporations [Southern and L & L], did you expect the tankerman who would operate this barge during discharge to acquire his flashlight from whatever tug was towing the barge on that particular occasion?
"A. Either for him to have his in his possession or to acquire it from the tug boat."

18. Christopher v. Grueby, 40 F.2d 8, 12 (1 Cir., 1930).

der the warranty of seaworthiness for any loss or injury during the demise. However, if the unseaworthiness existed at the time of the demise, the ultimate liability may rest upon the owner, either under an action by the demisee against the owner or in joint or separate actions against the demisee and/or owner. Cannella v. Lykes Bros. S.S. Co., 174 F.2d 794 (2 Cir., 1949). In this case it is clear that L & L, for all. purposes, turned the Barge over to Southern as soon as title was acquired from Crown. We cannot find from this record that the Barge was unseaworthy at *that* time and therefore, *in personam* liability cannot be imposed upon L & L.

We have serious doubts that a charter relationship existed between L & L and Southern. True, Law speaks of a charter and points to the change in the pumping system accomplished by Southern after L & L turned the Barge over to Southern. No charter agreement between L & L and Southern was introduced in evidence. If one existed, it was verbal with Law talking as the principal corporate officer and one-third stockholder of L & L, and Law listening as the president, general manager and 50% stockholder of Southern. When Southern conferred with L & L, it was Law doing the talking in behalf of Southern, and Law listening in behalf of L & L. As observed in footnote (1), it appears that the relationship was more in the category of a bailer-bailee. The record does not disclose the terms of the arrangement between L & L and Southern. L & L had no employees and had been in existence less than three months when the Barge was destroyed. In Jones & Laughlin Steel Corporation v. Vang, 73 F.2d 88 (3 Cir., 1934), Jones & Laughlin endeavored to limit its liability to the barge and her pending freight when a barge, owned by Vesta Coal Company and loaded with coal, broke loose from other barges owned by Jones & Laughlin after delivery had been made by Vesta Coal. The Court held that Jones & Laughlin could not limit its liability because it was not, in fact, a charterer of the barge, but was a mere bailee. Reference is made to the requisites of a charter party as set forth therein (73 F.2d 91). This is an additional reason why Southern should not be permitted to limit its liability.

■■■■■■ There is much to be said for the argument that Smith was a joint employee of both Southern and Vermillion Towing. Even in the case of an independent contractor relationship, it is apparently possible for an employee to serve two masters where the work to be performed is of mutual interest to both of two employers and to effect their common purpose. Dickerson v. American Sugar Refining Co., 211 F.2d 200, 203 (3 Cir., 1954). If ever there was a case of a common employee, this seems to be it. Smith was serving as mate on the Tug owned and operated by Vermillion Towing, and as tankerman on the Barge operated by Southern. For the purpose of this venture, the Tug and Barge were one unit with a common purpose of transporting, delivering and discharging cargo. Additionally, Southern and Vermillion Towing dealt almost exclusively with each other in this type of venture, and their activity was so intertwined in management and operation that one cannot readily draw a line between the purpose of one or the other, nor can one with assurance determine the attendant control of the employees. In addition to the reasons heretofore stated for imposing *in personam* liability upon Southern—as well as the reasons hereinafter set forth for finding *in personam* liability against Vermillion Towing—we hold that there was mutual employment of Smith and his negligence is binding upon both Southern and Vermillion Towing.

■■■■■■ Assuming arguendo that mutual employment is not a proper basis for affixing *in personam* liability upon Southern, and accepting for the purpose of discussion that Vermillion Towing was an independent contractor hired by Southern, there are further grounds for imposing liability upon Southern. If the activities of the hirer (Southern) and the independent contractor (Vermillion Towing) are so interrelated that the

failure to supply proper equipment and/or the use of improper equipment are productive of concurrent negligence, then joint liability is imposed. Sun Oil Co. v. Kneten, 164 F.2d 806, 809–810 (5 Cir., 1947). The nature of the activity in loading and discharging the combustible fuel is recognized as a hazardous undertaking and in Restatement, Torts, sections 416, 427 and 427A, it is generally provided, as an exception to the rule that the hirer (Southern) is not liable to third persons for losses attributable to negligence of the independent contractor (Vermillion Towing), that if the nature of the work to be performed imposes a nondelegable duty upon the hirer, or if the work is an inherently dangerous undertaking, then the hirer is answerable in damages to third persons injured as a result of negligent performance of the independent contractor to whom he delegates actual performance. Capitol Chevrolet Co. v. Lawrence Warehouse Co., 227 F.2d 169 (9 Cir., 1955).

██ We conclude, therefore, that Southern is liable *in personam* to all parties, other than Vermillion Towing, who have sought relief against Southern.

As to L & L, this corporation was merely a "dummy" entity organized for the purpose of holding legal title to the Barge. It had no employees and assuredly Smith was not performing work for L & L at the time and place in question. It had no assets other than the Barge which was sold for $2,500 after the fire. While L & L, as the owner of the Barge, loses the value of the Barge by reason of its unseaworthiness during the time it remained in the possession of Southern, we are unaware of any rule of law which would justify the imposition of *in per-*

*sonam* liability upon L & L. This issue is probably academic in any event.

## LIMITATION AS TO THE TUG AND LIABILITY OF VERMILLION TOWING

More difficult is the status of the Tug. Standing alone, and assuming that the Tug was not required to provide the approved flashlights or otherwise ascertain their availability, the owners of the Tug would be entitled to exoneration but for the peculiar circumstances of this case.

As heretofore noted, the Barge was unmanned. Smith, the mate on the Tug, was paid by Vermillion Towing. He was also paid by Southern for his services as tankerman (although the contract specified that Southern was to pay Vermillion Towing); however, this was additional pay and no deduction was made by Vermillion Towing for the time spent in loading or discharging the Barge [19] as Smith was paid by the day for his services as mate on the Tug.

The Tug pushed the Barge from Norfolk to Richmond. As such, it was an integrated tow operating as one unit. The pertinent question is whether the owner of the Tug, *having assumed the responsibility of providing crew personnel and necessary equipment in loading and discharging this unmanned Barge,* may now be exonerated or otherwise limit its liability where the equipment is inadequate and the Tug owner is chargeable with knowledge of such facts. While the issue is not free from doubt, we arrive at a negative answer to this inquiry.

It is not disputed that Vermillion Towing, acting through its principal corporate officer, Robert R. Vermillion, assumed the responsibilities aforesaid.[20]

---

19. The arrangement between Southern and Vermillion Towing called for Southern to pay $36.00 for services in loading and discharging the Barge. Customarily, Marshall (the master) and Smith (the mate) worked together in performing the duties of the tankerman. However, on this particular voyage Smith was to re-

20. Vermillion testified as follows:
"Q. Were you aware that the crew of the Tug RAVEN would have to use the ceive the entire $36.00. While the record is not clear as to the reason for this change of procedure, it is perhaps occasioned by the fact that Marshall did not assist in the loading operations at Nor-

The contractual agreement between Southern and Vermillion Towing specified that Southern would pay Vermillion Towing for crew members performing tankerman's services on the Barge, the aggregate sum of $36.00 for loading and discharging.

The precise authorities are sparse. Touching generally on the subject is Hartford Accident & Indemnity Co. v. Gulf Refining Co., 127 F.Supp. 469 (E.D. La., 1954), affirmed in part and reversed in part, 230 F.2d 346 (5 Cir., 1956). The principal distinguishing feature with the case at bar is that, in *Hartford*, the tug and barges were apparently under common ownership. The three barges were apparently unmanned and the tug crew performed the duties of discharging the barges. The Court of Appeals found that one of the barges was unseaworthy because the discharge line was open, and on the issue of responsibility said (230 F.2d 352):

> "The ultimate responsibility for making sure that all cargo lines were flanged, before the tow left Texas City, lay with the tow's master or with its pilot, who supervised the loading operation there."

■ For the purposes of the Limitation Statute, 46 U.S.C., sections 181–196, where the Tug and Barge are engaged in a single venture and under common ownership, the two vessels are generally regarded as a single unit and must be surrendered. The Alvah H. Boushell, 38 F. 2d 980 (4 Cir., 1930); United States v. The Australia Star, 172 F.2d 472 (2 Cir., 1949); Standard Dredging Co. v. Kristiansen, 67 F.2d 548 (2 Cir., 1933); In Re United States Dredging Corporation, 264 F.2d 339 (2 Cir., 1959). The authorities, while tending to emphasize the importance of a common adventure, do not materially assist in resolving the problem. In the present case there existed a common venture but no common ownership and, in addition, both the Tug and Barge were surrendered by their respective owners. Moreover, even in common ownership and single venture enterprises, it does not always follow that all vessels must be surrendered. Liverpool, etc., Nav. Co. v. Brooklyn Eastern District Terminal, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130 (1919).

■ Tested by these principles, the ultimate responsibility for providing adequate equipment for discharging the Barge in the present case rested upon Vermillion Towing in light of the fact that it controlled the Barge, assumed the obligation to provide a sufficient supply of approved flashlights, and supplied the personnel to carry on dischage operations. Marshall, the master of the Tug, admitted that, as master, he controlled the Barge.

On the subject of privity and knowledge of Vermillion Towing, much the same situation is presented with respect to approved flashlights as exists with Southern. Robert R. Vermillion knew that the crew of the RAVEN would, from time to time, act as tankermen on the Barge. He was aware of the necessity of approved flashlights for use in loading and discharging. Indeed he, like Law, Marshall, Smith and Carter, were all certificated tankermen. He never gave any instructions to any of the crew as to the use of flashlights, but assumed that a tankerman would know his business. He had no recollection of ever inspecting the Tug (following his initial inspection when the Tug was purchased in April at which time he *thinks* that there were three approved flashlights aboard) for the purpose of ascertaining whether a supply of approved flashlights was aboard the Tug. He testified that he would have supplied flashlights only if

folk and did not report for duty until after the Barge was fully loaded.
RAVEN flashlights when they went aboard the Barge 104 to service them?
"A. Yes, sir, they would have to use a flashlight.

"Q. Were you aware they had to use the flashlights from onboard the Tug RAVEN?
"A. Yes, sir."

requested to do so by the crew, and had no recollection of any such request being made.[21] Vermillion conceded that a tug could use any type of flashlight, and that only a barge required the Coast Guard-approved flashlights.

Since Vermillion Towing manifestly assumed the obligation of maintaining the approved flashlights for the Barge, and since its failure to do so rendered the Barge unseaworthy, Vermillion Towing is not entitled to exoneration from or limitation of liability, and is likewise liable *in personam*.

## THE CLAIMS OF L & L AND SOUTHERN IN VERMILLION TOWING'S LIMITATION ACTION, AND THE CLAIM OF VERMILLION TOWING IN THE LIMITATION PROCEEDING FILED BY L & L AND SOUTHERN

Because of the reasoning heretofore stated, there is no right on the part of L & L or Southern to be considered as a claimant in the limitation proceeding filed by Vermillion Towing, nor is there any right of Vermillion Towing to claim under the limitation action filed by L & L and Southern. They were, in effect, joint tortfeasors in a noncollision maritime injury case and are not entitled to contribution. Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952). Nor is there any right of indemnification. Hartford Accident & Indemnity Co. v. Gulf Refining Co., 230 F.2d 346, 354 (5 Cir., 1956).

Assuming arguendo that Vermillion Towing is entitled to exonera-

tion on the flashlight issue, we think that there is an added reason why Vermillion Towing cannot claim against L & L or Southern. While mooring the Tug fast to the Barge during discharge operations was not a proximate cause of the fire's origin, it was an unsafe procedure the risk of which was assumed by Vermillion Towing, thus barring any right to successfully claim against L & L or Southern.[21-A]

## THE COUNTERCLAIMS OF LAW, VERMILLION, MARSHALL AND SMITH AGAINST CROWN

Since the Court has determined that Crown was not responsible for the fire and resulting injury or damage, these counterclaims must fall.

## THE INDIVIDUAL LIABILITY OF MARSHALL, THE MASTER OF THE TUG, AND SMITH, THE TANKERMAN OF THE BARGE AND MATE ON THE TUG

The actions of Smith constituted gross negligence of a high degree and he is individually liable to those parties who elected to proceed against him. Smith's carelessness, while gross, fell short of being criminal negligence. The liability of Smith is independent of the liability of Southern and Vermillion Towing. It stems from the servant's common-law obligation so to use that which he controls as not to injure another. In the very performance of his duties as tankerman in discharging fuel, Smith owed a duty to the public, as well as to his employer. 57 C.J.S. Master and Servant § 577, pp. 345–346.

---

21. Marshall, the master of the Tug, testified that written requisitions were delivered to Vermillion for all supplies. No requisitions were introduced in evidence. As no crew members indicate that any requisition for approved flashlights was ever made, we assume that none were purchased after the Tug was acquired on or about April 15, 1961.

21-A. It may be argued that Crown should likewise be barred from recovery as the testimony of Hudgins reveals that he and Chadwick were cognizant of the fact that

such practice was generally regarded as unsafe. However, since the Court has determined that Smith's actions constituted the sole proximate cause of the fire, we do not believe that the unsafe practice, assuming that it existed, should bar Crown's right to recover. Primarily, at least, the practice of restricting the mooring of the Tug to the Barge is for the safety of those vessels and the parties aboard same. It is hardly a foreseeable circumstance that Crown's property ashore would have been destroyed.

Turning to the personal liability of the master of the Tug, Marshall, we are confronted with a different situation. There is no conflict in the evidence as to the fact that, on this particular trip, Smith was solely performing the duties of a tankerman although it is not unlikely that Marshall should have assisted. In a strictly legal sense Marshall, as master of the integrated tow, was in control of everything on the Tug and Barge in that all things were under his command.

 Under 46 U.S.C., section 187, it is expressly provided that nothing in the prior limitation statutes [22] shall be construed to take away or affect the remedy against the master (subject to exceptions), nor to lessen or take away any responsibility to which any master or seaman of a vessel may by law be liable. As early as 1865 the Supreme Court pointed out that the purpose of the limitation sections was to release the owner from some liability for conduct of the master and other agents of the owner, for which the master or other agents were themselves liable; i. e., negligence and fraud. Walker v. The Transportation Co., 70 U.S. (3 Wall.) 150, 153, 18 L.Ed. 172. Presumably the master and individual crew members are suable personally for their negligence, fraud, or other malversation.[23]

 In view of the fact that this was a non-collision maritime injury, we advert to the common law principles of master and servant to determine the issue of Marshall's individual liability. We conclude, on the evidence presented, that Marshall is not personally liable. There is no showing that he had knowledge of the fact that Smith was using a non-approved flashlight during discharge operations, nor did he observe the type flashlight being used at the time. An employee who does not participate in the acts of another employee of a common master, on which it is sought to predicate liability to a third person is not liable for such acts.[24] Even as to Trexler, Marshall cannot be held liable.[25]

 We do not believe that liability can be imposed upon Marshall merely because he was unaware of the lack of operable Coast Guard-approved flashlights aboard the Tug and Barge. The duty to properly equip the vessel rests with the owner or operator,[26] and, while a master may be individually liable if he knowingly permits or orders the use of obviously improper equipment, we do not reach that point. There was certainly no duty on the part of the master to warn a certificated tankerman as to the use of approved flashlights in discharging the cargo aboard this particular barge.

While the individual liability of Smith and Marshall may appear to be academic in a case such as this—as presumably no individual could respond to the damages sustained—the matter may be of importance as and when the judgments are paid. Since Smith was admittedly in direct control over the discharge operations aboard the Barge, his personal liability is fixed. Marshall is exonerated for the reasons stated herein, although this would probably not be true if the conclusion had been reached that the open pilot light in the galley proximately contributed to the losses as Marshall must assume the responsibility for mooring the Tug to the Barge.

### THE TREXLER CLAIM

Trexler, a crew member aboard the Tug, was born September 30, 1931. He was, therefore, approximately three months short of being thirty (30) years of age at the time of the tragic events

22. 46 U.S.C., sections 182, 183, 184, 185, 186.

23. Edelman, Maritime Injury and Death, Vol. 1, p. 577.

24. 57 C.J.S. Master and Servant § 577, p. 348.

25. 57 C.J.S. Master and Servant § 578, p. 350.

26. 57 C.J.S. Master and Servant § 578, p. 350; Banks v. Liverman, 129 F.Supp. 743, 747 (E.D.Va., 1955), affirmed, 226 F.2d 524 (4 Cir., 1955).

giving rise to his death four days [27] after the fire. He was survived by his wife (born August 13, 1933), and three children, Robert (born May 17, 1957), Robin (born July 4, 1958), and Debbie (born September 6, 1960). At age 29, Trexler had a life expectancy of 42.16 years under the Commissioner's Standard Mortality Tables of 1958.

■ The claimant suggests varying factors in determining damages to be awarded under the Jones Act, including (1) notice of the increased cost of living necessitating higher awards,[28] (2) prospects of advancement,[29] (3) prejudgment interest,[30] (4) loss of nurture, guidance and training as to children,[31] (5) pain and suffering prior to death,[32] and (6) the extent of the dependency of the widow and children; i. e., their "pecuniary loss." Agreeing that all of these factors are proper items for consideration, it is now well settled that there cannot be mathematical precision in all cases. Whitaker v. Blidberg Rothchild Company, 296 F.2d 554 (4 Cir., 1961); Gardner v. National Bulk Carriers, Inc., 333 F.2d 676 (4 Cir., 1964).

Counsel for the Tug and Barge, as well as for the owners and charterer contest the life expectancy of 42.16 years by stating that the Life Insurance Underwriters did not adopt, to any appreciable extent, the Commissioner's Standard Mortality Tables of 1958 until 1962, and that the tables in general use at the time of Trexler's death showed a life expectancy for a white male, age 29, to be 38.61 years. We believe that this is a distinction without a difference.[33] Bearing in mind that Trexler was very nearly 30 at the time of his death, we established his life expectancy at 42 years. We do agree that, in the use of such figures, his *working* life expectancy is more realistic at 36 years as, in modern days, retirement is considered normal at 65. Of course, even after retirement the average person generally has some benefits.

■ Counsel for Trexler makes a claim for wages lost to the date of trial. This is not a personal injury case and such a contention must be disregarded. Indeed, if the pecuniary loss is determined according to life expectancy as of the date of death, such an allowance for wage loss between death and the date of trial would be duplicitous.

In *Gardner,* supra, this Court fixed a discount rate of 3½%. We see no need to modify same. While it is true that investors may obtain a greater rate of return on their money, the offsetting factor is inflation.

For the six months of 1961 prior to his death, Trexler had gross earnings of $2,235.50. During 1960, he earned only $3,057.26. If we are to double his six months' earnings for 1961 to establish an annual wage, it would be the equivalent

---

**27.** Trexler expired on July 9, 1961, at 1:50 a. m.

**28.** Drowne v. Great Lakes Transit Corp., 5 F.2d 58, 60 (2 Cir., 1925); Virginian Rwy. Co. v. Rose, 267 F.2d 312, 316 (4 Cir., 1959).

**29.** Briscoe v. United States, 65 F.2d 404, 406 (2 Cir., 1933).

**30.** Gardner v. National Bulk Carriers, Inc., 221 F.Supp. 243, 247 (E.D.Va., 1963), affirmed, 333 F.2d 676, 677 (4 Cir., 1964).

**31.** *Gardner,* supra; Michigan C. R. Co. v. Vreeland, 227 U.S. 59, 71, 33 S.Ct. 192, 57 L.Ed. 417

**32.** St. Louis, Iron Mtn. & Southern Ry. v. Craft, 237 U.S. 648, 35 S.Ct. 704, 59 L.Ed. 1160 (1915); Hutchison v. Pacific-Atlantic Steamship Co., 217 F.2d 384, 386 (9 Cir., 1954).

**33.** Counsel for the owners of the Tug and Barge argue that, in any event, there should be a credit of $6,000 occasioned by the proceeds of a life insurance policy on Trexler's life, the premiums on which were paid by Vermillion Towing. They cite O'Connor v. United States, 269 F.2d 578, 585 (2 Cir., 1959), where the same question was discussed but not decided. In the opinion of this Court, the insurance policy was clearly a collateral source benefit which could never be the subject of a credit in a Jones Act recovery. Moreover, if allowed, would it be credited to all parties against whom judgment is to be entered?

of $4,471.00. His gross income for 1958 was $4,884.28, and for 1959 it was $4,360.09. Considering his age, some prospects for advancement, and the ever-changing wage scale, we believe that, over the period of his working life expectancy, he would have averaged $4,700.00 per annum, which takes into consideration that seamen rarely, if ever, are employed on a 12-month basis, although working on a tug is generally deemed to be more dependable and steady.

■ Before attempting to ascertain the pecuniary loss to the widow and children, it is first necessary to allocate and deduct Trexler's likely personal expenditures under the rule enunciated in O'Connor v. United States, 269 F.2d 578, 583 (2 Cir., 1959). See also: Gardner v. National Bulk Carriers, Inc., supra.

■ The widow testified that at each pay period (every two weeks), she would either go to the office to secure the check (if Trexler was away) or that Trexler would bring the check home, following which it would be deposited in the bank. She stated that Trexler took from $5.00 to $10.00 for his personal use whenever he was paid, and the balance was used for living expenses for the entire family. This is all of the evidence on this subject. Obviously, when at home, other personal living expenses were properly allocable to Trexler's presence in the household of five. In O'Connor, supra, when the case reached the Court of Appeals for the Second Circuit the first time (251 F.2d 939), a more or less arbitrary allocation was made for the support of the widow and one son. In Gardner, supra, where there was a widow and two children, this Court adopted a one-sixth percentage of annual contribution as being for the husband. In this case, we have one more child than in Gardner, plus the factor that a seaman

employed on a tug in local waters is likely to be at home more frequently than a seaman on foreign or coastwise voyages. With little to go on, we attribute one-fourth of Trexler's average earnings to his personal living expenses, such figure to include the small sums he received for personal use each payday. Thus, we arrive at the conclusion that the average annual contribution for the benefit of his wife and three children is $3,525. This is their average total annual "pecuniary loss."

Following the teachings of Gardner, and allocating 10% for each child (one son and two daughters), we find that the average annual "pecuniary loss" for each child is $352.50, or a total of $1,057.50 for the three children. The remainder is allocable to the widow, said average "pecuniary loss" based on actual computation being $2,467.50. Bearing in mind that some benefits may reasonably accrue after retirement, and that some adjustment as to personal living expenses and "pecuniary loss" to the widow would be made after the children reach majority, this latter figure is fixed at $2,600.

■ The beneficiaries will receive their pecuniary loss in advance of what they would have received if Trexler had lived.[34] Computed for a period of 36 years, the widow would have received the total sum of $93,600. The discounted value computed at 3½% (20.290) amounts to $52,754.

Unlike Gardner, supra, this is an appropriate case for the award of damages for conscious pain and suffering prior to death. Dr. Haynes testified that Trexler was burned over 95% of his body surface area, the burns being predominantly third-degree. He described the injuries as producing "a marked amount of pain and suffering." Dr. Haynes realized that the injuries would result

34. Because this pecuniary loss must be discounted is a further reason why prejudgment interest should be allowed. This case has been pending for several years and the responsibility for the delay must rest with the judge. Nothing further need be said about the matter except to note that the Norfolk-Newport News Divisions of the Eastern District of Virginia held the unique distinction of having the heaviest caseload in the nation for many years and, until September 1, 1967, additional judicial assistance was not forthcoming.

in death and, on July 9, 1961, at 1:50 a.m., Trexler expired. This was about four (4) full days from the time he sustained his burns. For a day or so following his admission to the hospital, Trexler was lucid but he later became irrational. Narcotics were used to mitigate the pain but it could not relieve it entirely and, in addition to the burns, Trexler was subjected to nausea, vomiting, thirst, etc.

The widow testified that Trexler was only able to mumble and could not carry on an intelligent conversation.[35] She attempted to describe his pain as best she could. Certain medical, hospital, and funeral expenses were likewise incurred.[36] For the conscious pain and suffering and miscellaneous expenses, the Court awards $17,500. This portion of the award is not subject to the discounted value, but is entitled to prejudgment interest. It will be divided as follows: The sum of $1,500 to each child and $13,000 to the widow. Gillespie v. U. S. Steel Corp., 379 U.S. 148, 149, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964). This part of the action would not survive if the claim was under the Virginia Wrongful Death Act. Va.Code, section 8–628.1

Agreeing with counsel for the Tug and Barge that the loss of a mother, under normal circumstances, is entitled to greater monetary consideration in determining a child's claim for nurture, guidance and training than would be applicable with respect to the loss of a father, the claim is nevertheless compensable. In *Gardner,* the sum of $200 per annum was allowed to each of the two children during their minority, subject to being discounted as noted above. However, that case involved a seaman who was away from home on foreign or coastwise voyages while following the sea. Trexler's occupation was not as demanding with respect to his absences from home. The Court awards $300 per year for each child, during their respective minorities, same to be discounted in the same manner as the pecuniary loss from decedent's earnings.

The issue involving prejudgment interest has now been resolved in this Circuit. *Gardner,* supra. Adopting the same reasoning set forth by this Court, and affirmed by the Court of Appeals, prejudgment interest at the rate of $3\frac{1}{2}\%$ per annum will be allowed from July 9, 1961, until the date of the entry of the final decree, and at the rate of 6% per annum thereafter until paid. The rate fixed for prejudgment interest is in line with the reasoning set forth in footnote 5 of the opinion of the trial court in *Gardner* (221 F.Supp. 243, 248).

Recapitulating the maze of figures in accordance with the awards herein made, and making allowance for the present value of $1.00, we arrive at the following:

To Myrtle Lucille Goodman Trexler—
　For conscious pain and suffering, medical, hospital and funeral expenses
　　The sum of $13,000.00, plus interest.

To Myrtle Lucille Goodman Trexler—
　For pecuniary loss discounted for 36 years

35. This is in marked conflict with the testimony of the other crew members, including Smith, who visited Trexler while in the hospital, and who purport to relate Trexler's version of what he saw when the fire broke out. The testimony was admitted for record purposes only as it was clearly objectionable. The visit to the hospital was apparently on July 8, which is referred to by Carter as being "the same day he died." We assume that they did not visit Trexler during the early morning hours of July 9. As Dr. Haynes testified that Trexler was irrational at that time the evidence, even though falling within the rule of a dying declaration, would not be entitled to any weight.

36. Since Trexler died ashore, at a time when he was entitled to medical care and maintenance, his burial expenses are apparently allowable under the Shipowners' Liability Convention of 1936. Funeral expenses are not allowable under the Virginia Death by Wrongful Act statute, and it is doubtful where such item is recoverable under FELA.

The sum of $52,754.00, plus interest.

To Guardian of Robert L. Trexler—

For pecuniary loss and loss of nurture, guidance and training, discounted for 17 years

The sum of $8,254.78, plus interest.

To Guardian of Robert L. Trexler—

Percentage of allowance for conscious pain and suffering

The sum of $1,500.00, plus interest.

To Guardian of Robin L. Trexler—

For pecuniary loss and loss of nurture, guidance and training, discounted for 18 years

The sum of $8,606.48, plus interest.

To Guardian of Robin L. Trexler—

Percentage of allowance for conscious pain and suffering

The sum of $1,500.00, plus interest.

To Guardian of Debbie L. Trexler—

For pecuniary loss and loss of nurture, guidance and training, discounted for 20 years

The sum of $9,273.33, plus interest.

To Guardian of Debbie L. Trexler—

Percentage of allowance for conscious pain and suffering

The sum of $1,500.00, plus interest.

 We come finally to the status of the Trexler claim against the parties determined to be at fault in this proceeding. Trexler's personal representative filed her action under the Jones Act as to the Tug RAVEN, in rem, Vermillion Towing, in personam, Barge 104, in rem, and L & L, Southern, William E. Law and Robert R. Vermillion, all in personam. She also sued Crown, in personam, under the Virginia Death by Wrongful Act statute. Having exonerated Crown, William E. Law and Robert R. Vermil-

lion, her action as to these defendants will be dismissed. However, as to the Barge, in rem, Southern, and L & L, the personal representative protected herself by asking for the benefits of "any other statutes of the United States or the State of Virginia and the General Admiralty Laws of the United States which are applicable to her causes of action herein stated." As this Court has found that Vermillion Towing was Trexler's employer, we agree with counsel for the Tug and Barge that Trexler's claim under the Jones Act rests solely against Vermillion Towing. As stated in Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 791, 69 S.Ct. 1317, 1322, 93 L.Ed. 1692 (1949):

"We have no doubt that, under the Jones Act, only one person, firm, or corporation can be sued as employer."

 The maximum recovery under the Virginia Death by Wrongful Act statute was, at the time of Trexler's death, limited to $30,000. Since the claim of the personal representative under the Jones Act well exceeds this amount, we assume that she still wishes to rely upon the Jones Act and, in fact, this is the exclusive remedy for a deceased seaman. Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686 (1930); Gillespie v. U. S. Steel Corp., supra. She cannot, of course, recover twice for the same death, even though there are other parties who may be held responsible. Smith was not sued by Trexler's administratrix. Under the Virginia Death Act, she would clearly be entitled to the maximum recovery against Southern, in personam, and the Barge, in rem, but she cannot recover in excess of that amount as to Southern, in personam, and the Barge, in rem. As indicated herein, L & L is not liable in personam, but does lose the value of the Barge as the same existed after the fire.

 In summary, a judgment will be entered in favor of Myrtle Lucille Goodman Trexler, Administratrix of the Estate of Robert W. Trexler, deceased, against the Tug RAVEN, in rem, and

Vermillion Towing Corporation, *in personam,* for the total sum of $96,388.59 together with interest thereon at the rate of 3½% per annum from July 9, 1961, to the date of the entry of the final decree, and at the rate of 6% per annum thereafter until paid. Judgments will likewise be entered in favor of Trexler's personal representative against the Barge 104, *in rem,* and Southern Transportation Company, Inc., *in personam,* in the sum of $30,000, plus interest as aforesaid, but the judgment order shall provide that the liability of the Barge 104, *in rem,* and the *in personam* liability of Southern Transportation Company, Inc. is joint and several with the judgment against the Tug RAVEN, *in rem,* and Vermillion Towing Corporation, *in personam,* only to the extent of the aforesaid $30,000, plus interest, and executions on these latter judgments will only be issued in the event that the judgment against Vermillion Towing Corporation is reversed on appeal or otherwise is not satisfied.

Questions involving the joint liability of a Jones Act employer and other negligent parties are complex. In Billiot v. Sewart Seacraft, Inc., 382 F.2d 662 (5 Cir., 1967), an action was brought by the personal representative of a deceased seaman who had been employed on a towboat owned by Seacraft, which towboat was being refueled from a barge belonging to McDermott. Tied to the barge was a ship also owned by McDermott. The decedent, according to the complaint, either "slipped and fell or was thrown" from either the barge or the towboat when the ship moved away from the barge, thus causing a slack line to become taut and striking the decedent. Liability of both Seacraft and McDermott was predicated upon the negligence of both, as well as the unseaworthiness of the barge and towboat.

There was a further claim for conscious pain and suffering prior to death. While the action against Seacraft and McDermott was pending in the federal court, the personal representative brought another action in the Louisiana state court naming Seacraft, McDermott, and other defendants. McDermott and the other state court defendants, except Seacraft, settled their cases with the plaintiff and obtained a general release. McDermott was then dropped as a party defendant in the federal court. Pursuing her action against Seacraft in the federal court, summary judgment was granted to the defendant on the basis of the settlement with McDermott. Relying primarily upon Loffland Bros. Co. v. Huckabee, 373 F.2d 528 (1967), the Court of Appeals for the Fifth Circuit reversed, holding that the amount of the settlement with McDermott would merely constitute a credit upon any recovery against Seacraft. Under this reasoning we perceive no reason why a judgment in the sum of $30,000 should not now be entered against Southern and the Barge 104, *in rem.* The Court may control the issuance of an execution on this judgment.

The doctrine enunciated in *Billiot* and *Loffland* permitting the injured party to pursue the full amount of damages has been approved in Smith v. Noble Drilling Corp., 390 U.S. 143, 88 S.Ct. 841, 19 L.Ed.2d 970 (1968).

An interlocutory decree will likewise be entered with respect to the remaining claimants seeking recovery against the interests of Vermillion Towing Corporation, L & L Towing Corporation, Southern Transportation Company, Inc., and Richard S. Smith.

Counsel will arrange for the presentation of an appropriate decree consistent with this memorandum.